UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

                Plaintiff,

v.

SEAN GERALD PENONCELLO,

                Defendant.

Case No. 15-CR-0120 (PJS/LIB)
Civil No. 18-CV-0266 (PJS)

ORDER

Katharine T. Buzicky, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Robert D. Richman, for defendant.

Defendant Sean Penoncello was convicted after a jury trial of two counts of producing child pornography and one count of possessing child pornography. He was sentenced to 400 months' imprisonment. The United States Court of Appeals for the Eighth Circuit affirmed Penoncello's sentence on direct appeal. *United States v. Penoncello*, 671 Fed. App'x. 399 (8th Cir. 2016).

This matter is before the Court on Penoncello's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Penoncello argues that he received ineffective assistance of counsel prior to trial—and that, had he received effective assistance, he would have accepted the government's original plea offer, pleaded guilty to one count of producing child pornography, and received a shorter sentence. The

Court agrees, grants Penoncello's § 2255 motion, and orders the government to again offer the original plea deal to Penoncello.

## I. BACKGROUND

Penoncello was indicted on a single count of production of child pornography on April 15, 2015. ECF No. 10. The details of the crime were horrific: The government alleged that a girlfriend of Penoncello's (N.T.) had visited his home on September 15, 2012, with her seven-year-old son (A.M.), her five-year-old daughter (A.L.M.), and an adult friend (S.H.). After N.T. was bitten by Penoncello's dog, S.H. drove her to an emergency room, and the children were left in Penoncello's care. Penoncello took advantage of the unsupervised access to A.L.M. by sexually assaulting her, recording the sexual assault for his viewing pleasure, and distributing images of the sexual assault over the Internet, where they will forever be available for the viewing pleasure of other pedophiles. Two years later, law-enforcement officers discovered images of A.L.M.'s assault on the computer of a suspect in Dayton, Ohio. After an extraordinarily careful and thorough investigation, Special Agent Craig J. Heidenreich of the Federal Bureau of Investigation was able to identify A.L.M. as the victim and Penoncello as the perpetrator.

Attorney Craig Hunter was appointed to represent Penoncello. ECF No. 9. On May 6, 2015, Hunter sent a letter to Penoncello advising him that, if he was convicted of

producing child pornography as charged in the indictment, he would be facing a mandatory minimum sentence of 15 years' imprisonment. ECF No. 144-1. That was true. *See* 18 U.S.C. § 2251(e). Hunter also advised Penoncello that the United States Sentencing Guidelines would recommend a sentence of life in prison. ECF No. 144-1. That was not true. Because of the statutory maximum, the Guidelines would actually recommend a sentence of 30 years' imprisonment. *See* 18 U.S.C. § 2251(e); U.S.S.G. § 5G1.1(a). (Penoncello was 41 years old at the time.)

Six days later, on May 12, 2015, Hunter met with Penoncello. ECF No. 162 at 11. Hunter testified that he again advised Penoncello about the 15-year mandatory minimum and the Guidelines' recommendation of "life," but Hunter admitted that he had no recollection of advising Penoncello—at this meeting or at any other time—about the statutory maximum. *Id.* at 11-12. Hunter also warned Penoncello that if he did not plead guilty, he "would not get the three-point reduction for acceptance of responsibility and would likely have a much harder time convincing the Judge he should impose only the [15-year] mandatory minimum." *Id.* at 12-13.

For his part, Penoncello testified that Hunter never informed him—during their initial meeting or at any other time—about the 30-year statutory maximum. *Id.* at 46-47. Penoncello further testified that, during their initial meeting, Hunter told Penoncello that he had recently been successful in winning the acquittal of a defendant at trial. *Id.*

at 44. Hunter conceded that Penoncello's testimony on this last point "may" be correct. *Id.* at 13. (It is difficult to know how Penoncello would know of that acquittal if Hunter had not told him.)

On May 26, 2015, Assistant United States Attorney Katharine Buzicky advised Hunter that Penoncello had until June 3, 2015 to plead guilty to the pending indictment. ECF No. 144-2. Buzicky warned that, if Penoncello did not do so, the government would seek a superseding indictment that would add a second count of production of child pornography and a count of possession of child pornography. *Id.* The second production-of-child-pornography count was based on newly discovered evidence that, months before he recorded himself sexually assaulting A.L.M., Penoncello had recorded himself engaging in sexual intercourse with his son's babysitter (A.O.)—a troubled 14-year-old girl. Penoncello's face does not appear in the videos, but Penoncello's voice is heard, A.O. is heard referring to him as "Sean," and Penoncello's son appears in a portion of one video. The new possession-of-child-pornography charge was based on a large cache of child pornography that law-enforcement officers found at the time of Penoncello's arrest on two thumb drives that had been hidden in a vent in Penoncello's home. Those thumb drives not only contained images and videos of Penoncello's sexual abuse of A.L.M. and A.O., but numerous other images and videos of child pornography. Images and videos of Penoncello's sexual abuse of A.L.M. and A.O. were

also found on Penoncello's password-protected smartphone, which he was carrying at the time of his arrest.

That was not all. Penoncello had been employed as a janitor at the AmericInn in Virginia, Minnesota. At the time of Penoncello's arrest, law-enforcement officers found in his vehicle a video-recording device disguised as an outlet cover. An examination of that video-recording device and the thumb drives found in Penoncello's home revealed that Penoncello had installed the device in a changing room near the pool at the AmericInn and surreptitiously recorded women and girls as they undressed. The first recording on the device was actually a video of Penoncello installing the device; although Penoncello's face cannot be seen, the man installing the device is wearing two distinctive articles of clothing that were found in Penoncello's home. The government did not charge Penoncello with any crimes in connection with his recording of the unsuspecting women and girls at the AmericInn, but there was no doubt that the government would attempt to introduce evidence of Penoncello's conduct at trial.

After being told by Buzicky that Penoncello had to plead guilty by June 3, 2015 if he wanted to avoid a superseding indictment, Hunter met with Penoncello on May 26, 2015, and then again on June 1, 2015. ECF No. 144 at 2. The two discussed the discovery of the recording of A.O. and the possibility of Penoncello accepting a plea

deal.  *Id.*  Echoing his earlier advice, Hunter again told Penoncello that he faced a

15-year mandatory minimum and a Guidelines recommendation of life.  ECF No. 162

at 14-19.  This, again, was incorrect.  Because of the statutory maximums, the Guidelines

range was 30 years under the original indictment (one count of production with a 30-

year maximum) and would become 80 years under the superseding indictment (two

counts of production with 30-year maximums and one count of possession with a 20-

year maximum).  *See* 18 U.S.C. §§ 2251(e), 2252(b)(2).  Hunter testified that he had no

recollection of *ever* advising Penoncello about *any* of the statutory maximums for the

crimes charged in the original or superseding indictments.  ECF No. 162 at 14-22.

Penoncello testified that Hunter in fact never informed of him of the maximums, and

thus, as far as Penoncello was concerned, his exposure would be the same whether he

pleaded guilty to the original indictment or was convicted of all of the charges in the

superseding indictment:  Either way, he would be looking at a 15-year mandatory

minimum and a Guidelines recommendation of life.  *Id.* at 46-47.

Penoncello did not plead guilty to the original indictment, and on June 9, 2015,

the promised superseding indictment was returned against Penoncello.  ECF No. 27.  At

this point, Penoncello found himself charged with two counts of producing child

pornography (for recording his sexual abuse of A.L.M. and A.O.) and one count of

possessing child pornography (for possessing a large collection of child pornography on

the thumb drives found in his home).  Two months later, on August 9, 2015, Buzicky

offered another plea deal to Penoncello through Hunter, this one requiring Penoncello

to plead guilty to one count of production of child pornography and one count of

possession of child pornography.  ECF No. 144-3.  Buzicky said that Penoncello could

still receive the three-point reduction for acceptance of responsibility, but she warned

that after August 31, 2015, the government would not agree to any plea deal, so if

Penoncello wanted to plead after August 31, "he would have to plead straight up."  *Id.*

Hunter again met with Penoncello to discuss his options.  ECF No. 149 at 3.

Hunter testified that, once again, he advised Penoncello that he was facing a 15-year

mandatory minimum and a Guidelines recommendation of life.  ECF No. 162 at 19-22.

Hunter also testified that, once again, he had no recollection of advising Penoncello

about the statutory maximum (50 years under the government's latest offer).  ECF

No. 162 at 19-21; 18 U.S.C. §§ 2251(e), 2252(b).  Penoncello testified that he continued to

be ignorant of the statutory maximums and knew only that, if he pleaded guilty, he

would be subject to a 15-year mandatory minimum, and the Guidelines would

recommend a sentence of life.  ECF No. 162 at 46-47.

Hunter also testified that he had no memory of discussing with Penoncello any

of the other negative consequences that Penoncello could suffer if he went to trial, with

one exception:  Hunter told Penoncello that, if he went to trial, he would "have a much

harder time convincing the Judge [to only impose] the mandatory minimum." ECF

No. 162 at 26. But Hunter did "[not] recall specifically discussing [anything] . . . beyond

that." *Id.* In particular, Hunter testified that he "[could not] say" that he ever told

Penoncello "that the best way to achieve the best sentence would be to plead guilty and

accept responsibility." *Id.* Hunter further testified that he never told Penoncello that

taking the stand and perjuring himself at trial could result in the judge imposing a

longer sentence. *Id.* at 27.

Penoncello testified that, far from warning him of the negative consequences of

going to trial, Hunter actually told him that no one would much care if he opted to go to

trial. Specifically, Hunter told Penoncello "that the prosecution would chalk it up as

training and that there would be no penalty for going to trial." *Id.* at 45. Hunter did not

dispute Penoncello's claim.[1] Finally, Hunter testified that while he personally believed

that the evidence against Penoncello was overwhelming and that it was in Penoncello's

---

[1]Hunter was not asked about Penoncello's testimony, *see* ECF No. 162 at 8-39, but one of the briefs that Hunter filed on Penoncello's behalf in connection with sentencing seems consistent with Penoncello's claim. *See* ECF No. 94 at 2 ("The government did have to expend the effort and resources to prepare and present the case, but that gave the attorneys and lead agent invaluable experience in the preparation and presentation of these cases and is not a basis for a substantially increased sentence.").

Hunter's affidavit regarding Penoncello's § 2255 motion also does not deny this allegation, but simply notes that Hunter "believe[d that he] told Mr. Penoncello that the fact alone that the case tried would not be the main determining factor in sentencing." ECF No. 144 at 14.

best interest to plead guilty, Hunter "[could not] say" that he ever mentioned this to Penoncello. *Id.* at 27. Hunter explained that the reason why he never informed Penoncello of the advantages of pleading guilty was "because [Penoncello] steadfastly denied that he had committed the offense," and thus Hunter believed that "[t]here was no basis for a plea." *Id.* at 26.

Penoncello went to trial on September 21, 2015. ECF No. 69. The prosecution introduced a mountain of evidence that Penoncello had sexually abused A.L.M., recorded the sexual abuse, and distributed images of the sexual abuse via the Internet; that Penoncello had sexually abused A.O. and recorded it; that Penoncello had maintained a large collection of child pornography in his home and on his smartphone, including depictions of his sexual abuse of A.L.M. and A.O.; that Penoncello had secretly recorded women and girls undressing in the changing room at the AmericInn; and that Penoncello had lied repeatedly when interviewed by law-enforcement agents before and after his arrest. Both N.T. (A.L.M.'s mother) and A.O. gave credible and moving testimony. The evidence left no doubt that Penoncello was guilty of the crimes charged.

Penoncello defended himself by taking the stand, insisting that he was innocent of any crime, and presenting the theory that he had been framed by a man named "Jesse"—whom, Penoncello said, had been his rival for the affections of a woman

(although Penoncello had never actually met Jesse). *See* ECF No. 114 at 211-39; ECF

No. 118 at 7-33. Penoncello's theory was that, in order to get back at him for something

or other, Jesse had sexually assaulted A.L.M. in Penoncello's home during the brief

window of time on September 15, 2012 when N.T. was at the emergency room,[2]

recorded the assault using the same type of smartphone that Penoncello owned at the

time, circulated images of the assault on the Internet, and two years later planted

photographs and video of the assault on Penoncello's new (password-protected)

smartphone. And, apparently fearing that he had not done enough to get Penoncello in

trouble, Jesse also managed to persuade the 14-year-old babysitter of Penoncello's son

to have sex with Jesse and allow him to record it—and, during the recording, Jesse

pulled off a convincing imitation of Penoncello's voice, got A.O. to call him "Sean," and

even recorded Penoncello's son at play in his own house. (Nearly three years later,

Jesse also planted photographs and video of his encounter with A.O. on Penoncello's

new smartphone.) Just in case that was not enough, Jesse also took the time to amass a

large collection of child pornography, download it to two thumb drives, add images

_____

[2]Penoncello testified that, when N.T. and her children visited him, they had been accompanied not just by S.H., but by other men whom he did not know. Penoncello also testified that, after S.H. took N.T. to the emergency room, Penoncello left his home to help his mother, leaving N.T.'s children alone with N.T.'s other male friends. Penoncello said that, since he did not know what Jesse looked like, one of those male friends could have been Jesse. ECF No. 114 at 221-22; ECF No. 118 at 27. (N.T. and S.H. testified that no men accompanied them to Penoncello's home. ECF No. 114 at 22-23, 25-26, 43.)

and video of A.L.M. and A.O., and hide the thumb drives in a vent in Penoncello's home. And to put the icing on the cake, Jesse stole some of Penoncello's clothing, wore it while installing a hidden video camera in the women's changing room at the AmericInn (Penoncello's employer), returned the clothing without Penoncello noticing that it had been missing, recorded women and girls taking off their clothes, removed the video camera, copied the recordings to the thumb drives that he later hid in Penoncello's home, and stashed the video camera in Penoncello's vehicle shortly before the police arrested him.

That was Penoncello's defense—as preposterous a defense as was ever presented in a federal courtroom. After three days of trial (and to the surprise of absolutely no one), the jury convicted Penoncello of all charges after a brief deliberation. ECF Nos. 73, 78.

Penoncello appeared before the Court for sentencing on March 10, 2016. ECF No. 99. Hunter requested a downward variance and a sentence of 15 years' imprisonment (the mandatory minimum). ECF No. 89. The government sought a sentence of 480 months' imprisonment. ECF No. 90. The Court sentenced Penoncello to a total of 400 months' imprisonment. ECF No. 99. The Court acknowledged that this was "an extremely long sentence," but found that such a lengthy sentence was warranted because "Mr. Penoncello committed some of the worst crimes that [the Court

had ever] seen, and [then] refused to take any responsibility for those crimes."  ECF

No. 119 at 20-21.  The Court said that "[t]he evidence against Mr. Penoncello was

overwhelming" but that, "[i]nstead of admitting to [his] crimes . . . Mr. Penoncello told

pathetic lies to investigators and then, at trial, took the stand and perjured himself by

telling a preposterous story about a frame-up that was so complicated that not even the

CIA could've pulled it off."  *Id.* at 23-24.

Penoncello appealed his conviction and sentence in an *Anders* brief filed by

Hunter.  Brief for Appellant, *United States v. Penoncello*, 671 Fed. App'x. 399 (8th Cir.

2016) (No. 16-1711).  The Eighth Circuit rejected all of Penoncello's arguments.  *See*

*United States v. Penoncello*, 671 Fed. App'x. 399 (8th Cir. 2016).

Now before the Court is a § 2255 motion filed by Penoncello alleging ineffective

assistance of counsel in numerous respects.  *See* ECF Nos. 140, 141, 142.  The Court

scheduled an evidentiary hearing on Penoncello's petition and appointed Robert

Richman to serve as counsel.[3]  ECF Nos. 147, 148.  At the evidentiary hearing,

Penoncello withdrew all of his claims save two:  a claim that he received ineffective

assistance during the plea-bargaining process, and a claim that he received ineffective

---

[3]The Court expresses its appreciation to Richman for agreeing to take on
Penoncello's case.  Richman did excellent work in narrowing and clarifying the issues
and advocating on Penoncello's behalf.

assistance at sentencing because Hunter did not present any mitigating evidence.  ECF

No. 162 at 3-6.  The Court needs to address only the first of those claims.[4]

## II. ANALYSIS

To establish ineffective assistance of counsel, Penoncello must satisfy the familiar

two-part *Strickland* standard, establishing both deficient performance and prejudice.

*Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012); *Strickland v. Washington*, 466 U.S. 668, 687

(1984).  That is, Penoncello must show both that his "counsel's representation fell below

an objective standard of reasonableness" and "that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  *Strickland*, 466 U.S. at 688, 694.

### *A. Deficient Performance*

Defense counsel has the duty to provide a client with sufficient information

about the client's sentencing exposure to allow the client "to make a reasonably

informed decision [regarding] whether to accept a plea offer."  *United States v. Day*, 969

F.2d 39, 43 (3d Cir. 1992) (citations omitted); *see also United States v. Herrera*, 412 F.3d

577, 580 (5th Cir. 2005) (defense counsel has an obligation to "[a]ppris[e] a defendant

---

[4]Because the Court is granting Penoncello's § 2255 motion based on ineffective
assistance of counsel before trial, the Court will likely need to re-sentence Penoncello,
Penoncello will have a chance to present mitigating evidence at the re-sentencing
hearing, and his claim of ineffective assistance at his previous sentencing hearing will
then be moot.

about his [sentencing] exposure under the sentencing guidelines"); *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) ("A criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.").

Defense counsel also has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (quoting *Libretti v. United States*, 516 U.S. 29, 50-51 (1995)). This means that defense counsel should inform a client about the "relevant circumstances" surrounding a potential plea, including the risks of declining a plea deal and proceeding to trial. *Herrera*, 412 F.3d at 580. "A defendant cannot make an intelligent choice about whether to accept a plea offer unless he fully understands the risks of proceeding to trial." *Id.* (citing *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995))).

Hunter failed to fulfill these duties to Penoncello.

Hunter did not give Penoncello accurate information regarding his sentencing exposure. Hunter told Penoncello about the 15-year mandatory minimum sentence, but he never told Penoncello about the maximum sentences for any of the crimes with which he was charged. Hunter also repeatedly and inaccurately told Penoncello that the Guidelines recommended a sentence of life. Thus, Penoncello was under the mistaken assumption that his sentencing range would be 15 years to life—whether he

took the initial plea offer or went to trial. Penoncello never understood that one of the costs of turning down the initial plea offer was to increase his sentencing exposure from 30 years to 80 years. Not informing Penoncello that rejecting the initial plea offer would result in a *50-year* increase in sentencing exposure was deficient performance. *See Wanatee v. Ault*, 259 F.3d 700, 703-04 (8th Cir. 2001) (finding that it was deficient performance to grossly misadvise the defendant regarding his sentencing exposure); *see also Herrera*, 412 F.3d at 579-81 (same); *United States v. Grammas*, 376 F.3d 433, 435-37 (5th Cir. 2004) (same); *Smith*, 348 F.3d at 552-53 (same); *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (same); *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997) (same); *Day*, 969 F.2d at 41-44 (same).

Hunter also never advised Penoncello of the material advantages of accepting the initial plea offer—or, conversely, of the material disadvantages of proceeding to trial. Instead, Hunter led Penoncello to believe that, if he went to trial, he would not suffer any negative consequences, except that he "would not get the three-point reduction for acceptance of responsibility" and he "would likely have a much harder time convincing the Judge [to] impose only the [15-year] mandatory minimum." ECF No. 162 at 12-14.

As far as Penoncello was concerned, a three-point reduction in his offense level for accepting responsibility was meaningless, as his offense level would likely be capped at 43 whether he received the three-point reduction or not. *Id.* at 44. (The Court

ultimately calculated that, without the cap, Penoncello's offense level would be 51. ECF No. 119 at 5.) And simply stating that it would be "much harder" to get a 15-year sentence did not convey the full consequences of going to trial or equip Penoncello to make an informed decision.

Penoncello was never told that the evidence against him was overwhelming and that he was certain to be convicted, even though Hunter had himself reached that conclusion. Although Hunter claimed that he "tried to review" the evidence with Penoncello, Hunter noted that he believed that Penoncello should have been able to "recognize the clear inference from all of the facts against him." ECF No. 162 at 27-28. Further, Hunter did not "recall specifically" telling Penoncello that he would almost certainly be convicted, but surmised that he may have told him he had "great risk." *Id.* at 28.

Hunter owed Penoncello a duty to explain the likely consequences of going to trial—not just to hope that Penoncello would figure that out for himself. Penoncello was neither smart nor well educated. He had no legal training. He had never before been charged with a federal crime nor even with a felony; instead, his criminal record was made up entirely of misdemeanors and petty misdemeanors (mostly traffic offenses). The prospect of facing at least 15 years in a federal prison on a child-pornography offense had him grasping for straws. Without question, a reasonable

attorney in Hunter's possession would have told Penoncello that the evidence against him was overwhelming and that he had no realistic chance of being acquitted. Not only did Hunter fail to inform Penoncello of this fact, but Hunter made other statements—such as telling Penoncello "there you go" after Penoncello explained the Jesse-framed-me theory—that could have encouraged him to believe that he could be acquitted. ECF No. 162 at 48 ("[W]hen we were talking about Jesse . . . he did encourage me. He said, well, there you go . . . [I took that as a v]ery positive, that we could win.").

Hunter also never warned Penoncello of the likely impact on his *sentence* if he went to trial. As any experienced criminal defense attorney knows, the cost of going to trial is not just the loss of a three-point reduction in the offense level for acceptance of responsibility. The cost is also that the judge (who has tremendous discretion in setting a sentence) will sit in the courtroom with the defendant, hour after hour, immersed in evidence about the horrible things the defendant has done. That cost is compounded when victims or their loved ones take the stand and tell the judge about the often devastating impact of the defendant's actions. That cost is compounded even further when the defendant takes the stand, swears to tell the truth, and then perjures himself. That cost is compounded yet further when the defendant attacks his victims or their family members. And then, at the sentencing hearing, neither the defendant nor his

attorney is likely to be able to give an effective allocution, as both have to maintain the pretense that the defendant did not commit a crime. It is difficult for a defendant to express remorse for something that he claims not to have done.

Hunter had an obligation to inform Penoncello that the best way to minimize his sentence was to tell the truth, plead guilty, and accept responsibility for what he had done. Hunter did not do so. Hunter admitted that he personally believed that it was in Penoncello's best interests to plead guilty, but he "[could not] say" that he gave that advice to Penoncello. *Id.* at 27. To the contrary, Hunter told Penoncello "that there would be no penalty for going to trial." *Id.* at 45.

For these reasons, the Court finds that, prior to trial, Penoncello did not receive effective assistance of counsel because Hunter did not fulfill the "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla*, 559 U.S. at 370 (quoting *Libretti*, 516 U.S. at 50-51).

### B. Prejudice

To establish prejudice, Penoncello "must demonstrate a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012). Penoncello also must establish—again by a "reasonable probability"—that the government would not have withdrawn the plea offer before he accepted it, that the Court would have accepted the

plea agreement, and "that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* A "reasonable probability" does not require a showing that something is more likely than not. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). It does, however, require a showing that something is more than a mere possibility. *Paul v. United States*, 534 F.3d 832, 837 (8th Cir. 2008) (citing *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005)).

The government points out that Penoncello consistently maintained his innocence—when interviewed by law enforcement before he was arrested, when interviewed by law enforcement after he was arrested, in privileged conversations with Hunter, at trial, at sentencing, and even in his § 2255 motion. Not until the evidentiary hearing on his § 2255 motion—after he had been advised by new counsel—did Penoncello finally admit that he was guilty of the crimes charged. Thus, argues the government, it is highly unlikely that Penoncello would have accepted the government's initial plea offer, even if he had been competently advised.

The government's argument—and the Court's own observations of Penoncello—give the Court pause. Penoncello did not simply deny his guilt, but he did so repeatedly and vociferously (sometimes with tears in his eyes). He seemed terrified at the thought of going to prison, and he seemed eager to grasp at any straw. Even in his § 2255 motion, Penoncello continued to deny his guilt, suggesting that, had he been

competently advised, he could have entered a plea of nolo contendere to the child-production charge in the original indictment.  ECF No. 141 at 10-11.[5]  But after carefully considering the context in which Penoncello maintained his innocence, the Court finds that there is "a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel."  *Frye*, 566 U.S. at 147.

Had Penoncello been adequately advised, he would have been told the following:

1. Going to trial would increase his sentencing exposure by 50 years.

2. If he accepted the government's plea offer, the worst-case scenario was that he would receive a sentence of 30 years, meaning that he would be released from prison while he was still in his 60s.  If he went to trial, the worst-case scenario was that he would receive a sentence of 80 years, meaning that he would die in prison.

3. The evidence against him was overwhelming.

4. He had no viable defenses.

5. If he went to trial, he would certainly be convicted.

---

[5]Penoncello is mistaken on this point.  A defendant may not plead nolo contendere without the consent of the judge, *see* Fed. R. Crim. P. 11(a)(1)—and, of course, a defendant may not plead nolo contendere pursuant to a plea agreement without the consent of the government.  The judges of this District almost never accept nolo pleas (the undersigned has never done so), and the U.S. Attorney's Office for this District almost never agrees to nolo pleas.  Penoncello would not have been able to plead nolo contendere to the charge against him.

6.      The framed-by-Jesse theory that he had concocted was ridiculous and would surely be rejected by the jury.

7.      In order to pursue that theory, Penoncello would have to testify and almost certainly commit perjury.  That would likely result in a longer sentence.

8.      In order to pursue that theory, he would have to attack one of his child victims (A.O.).  That would likely result in a longer sentence.

9.      If the case was tried, the judge would spend three or four days listening to evidence about the horrible things he had done.  That would likely result in a longer sentence.

10.     If the case was tried, the judge would not only *hear* about the awful things he had done, but *see* them.  For example, the judge would have to view the video of him sexually assaulting a five-year-old girl, the video of him sexually abusing a vulnerable 14-year-old girl, and the videos he made of unsuspecting women and girls undressing at the AmericInn.  That would likely result in a longer sentence.

11.     If the case was tried, the judge would not only hear about his victims, but the judge would meet them and hear them testify in person about how they had been harmed by Penoncello.  That would likely result in a longer sentence.

12.     If he testified at trial and denied any wrongdoing, he could not credibly accept responsibility or express remorse at his sentencing hearing.  That would likely result in a longer sentence.[6]

---

[6]Hunter testified that he advised Penoncello—after trial—that the "best approach" to his sentencing hearing would be to "tell the Court what had happened." ECF No. 162 at 38-39.  Penoncello denies that Hunter gave him that advice; according to Penoncello, Hunter told him not to admit any wrongdoing "because of the appeal."

(continued...)

Hunter breached his obligation to convey this information to

Penoncello—clearly, concretely, and emphatically—so that Penoncello could

understand the risks of going to trial and make an informed decision about whether to

accept the initial plea offer.  At the evidentiary hearing, Hunter explained that, because

Penoncello was adamant about his innocence, Hunter did not think it would do any

good to share this information with him.  But it is extremely common for a

defendant—particularly one charged with a crime as opprobrious as producing child

pornography—to initially deny guilt, only to later admit what he did and plead guilty.

*See, e.g.*, *Kates v. United States*, 930 F. Supp. 189, 192 (E.D. Pa. 1996) ("I have seen many a

defendant, seemingly utterly intransigent as to the possibility of pleading guilty, finally

cave in when confronted with the ugly reality of what probably would happen to him if

_____

[6](...continued)
ECF No. 162 at 62-63.  The Court credits Hunter's testimony.  Hunter is well known to
the Court and, whatever mistakes he may have made while representing Penoncello,
the Court knows Hunter to be honest almost to a fault.  That honesty was evident at the
hearing, during which Hunter admitted making several mistakes.

Penoncello did not follow Hunter's advice to be honest about his crimes at the
sentencing hearing.  Instead, Penoncello mostly talked about the impact of his
incarceration on his mother (who was gravely ill) and his young son.  ECF No. 119
at 9-11.  The Court does not give this fact much weight, however.  Penoncello had
repeatedly testified under oath that he had not committed a crime.  He could have
reasonably calculated that changing his story at the last minute and professing regret
for his crimes would not have had much impact on his sentence but would have
eliminated any chance of having his conviction overturned on appeal or in a § 2255
proceeding.

he did not."). The fact that Penoncello was proclaiming his innocence was not an excuse for withholding from him information about the risks and benefits of going to trial.

It is instructive to compare this case to *Julian v. Bartley*, 495 F.3d 487 (7th Cir. 2007). Prior to trial, the defendant in *Julian* was advised by his attorney that, if he pleaded guilty, he would receive a sentence of 23 years' imprisonment and that, if he went to trial and was convicted, the maximum sentence he could receive was 30 years. *Id.* at 499. The defendant decided to roll the dice, went to trial, and was convicted. *Id.* at 489-90. The defendant then learned that the maximum sentence he was facing was not 30 years (as his attorney had advised him), but 60 years. *Id.* at 499.

The Seventh Circuit rejected the government's argument that, had the defendant been properly advised, he would nevertheless have gone to trial. The court explained that, based on his attorney's advice, the defendant "believed he was only risking seven additional years for a chance at acquittal," but "[i]n actuality, [he] was risking thirty-seven years for the chance at acquittal." *Id.* The court reasoned that "[t]o gamble with seven years for the slim chance of acquittal might be a reasonable calculus for some. It is hard to imagine, however, that any reasonable defendant would be willing to risk thirty-seven years for the remote chance of acquittal." *Id.*[7]

_____

[7]*See also Gordon*, 156 F.3d at 381 ("great disparity between the actual maximum

(continued...)

Notably, the defendant in *Julian* had been told that, if he lost at trial, he would receive a longer sentence; in other words, the *Julian* defendant at least knew that there would be *some* cost to going to trial.  Penoncello did not know even that.  Penoncello had not been told that his sentencing exposure would increase by 50 years if he rejected the government's plea offer and went to trial, but instead was led to believe that his exposure would be the same (15 years to life).  Penoncello was also told that the government would not care if he went to trial, but would just "chalk it up as training." ECF No. 162 at 45.  And Penoncello was not told of any of the myriad ways that going to trial would likely result in the judge giving him a longer sentence.  Under the circumstances, Penoncello made the rational decision that, "looking at [a] life [sentence either way] . . . and with nothing to lose, I thought we had to go to trial."  *Id.* at 44.

_____

(...continued)
sentencing exposure under the Sentencing Guidelines and the sentence exposure represented by defendant's attorney provides sufficient objective evidence" that—"when combined with a petitioner's statement concerning his intentions"—"support a finding of prejudice under *Strickland*"); *Gaviria*, 116 F.3d at 1512-13 (finding it "quite likely" that a defendant would have accepted a plea offer had he known that his sentencing exposure under the plea deal was 188-262 months, and not 360 months to life); *Day*, 969 F.2d at 45 (reversing the district court's finding of no prejudice and remanding for an evidentiary hearing because the court did "not find it at all implausible that a young man would think twice before risking over 3800 extra days in jail just to gain the chance of acquittal of a crime that he knew that he had committed").

This is not something that Penoncello invented while preparing for the evidentiary hearing on his § 2255 motion. More than two years earlier, Penoncello wrote a letter to his mother—a letter that Penoncello had no reason to believe would be read by anyone but his mother. *See* Def. Ex. 12. In that letter, Penoncello explained to his mother that Hunter had advised him that he would "be looking at the same sentence" whether he pleaded guilty or went to trial. *Id.* at 1. Penoncello told his mother that it was not until "months after [sentencing]" that he learned that he "would be looking at a lot less time" if he had pleaded guilty. *Id.*

In sum, had Penoncello received effective assistance of counsel, he would have understood that it was utterly irrational for him to turn down the government's plea offer and go to trial. He had nothing to gain and everything to lose. Defendants are human beings, of course, and human beings sometimes act irrationally (particularly when under great stress). But, in order to establish prejudice, Penoncello need only establish a "reasonable probability" that, had he received the effective assistance of counsel, he would have accepted the government's initial plea offer. *Frye*, 566 U.S. at 147. Penoncello has done so.[8]

---

[8]In resisting this conclusion, the government relies on *Sanders v. United States*, 341 F.3d 720 (8th Cir. 2003). That reliance is misplaced. The defense counsel in *Sanders* gave his client incorrect advice about the Sentencing Guidelines, but nevertheless conveyed to his client that he would receive a *much* shorter sentence if he pleaded guilty. *Id.* at 722. Moreover, counsel's error made pleading guilty look *more* enticing than it

(continued...)

Penoncello must also establish a "reasonable probability" that the government would not have withdrawn the plea offer before he accepted it, that the Court would have accepted the plea agreement, and "that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147. None of these factors is in dispute. Buzicky told Hunter that the original plea offer would remain open until June 3, 2015, and Buzicky is a prosecutor who keeps her word. The Court is not aware of any reason why it would have rejected the plea agreement. And the Court does not doubt that it would have given Penoncello a sentence substantially below 400 months if he had accepted the government's plea agreement and testified honestly about his crimes at the change-of-plea hearing.

Even if the Court had imposed the statutory maximum sentence, Penoncello would have received a sentence of 360 months—40 months below the sentence he ultimately received. And it is unlikely that the Court would have imposed the statutory

---

[8](...continued)
actually was. *Id.* Unsurprisingly, then, the defendant could not establish that, had he received accurate advice about the Sentencing Guidelines, he would have pleaded guilty. *Id.* at 723.

Here, by contrast, Hunter did not convey to Penoncello that he would receive a shorter sentence if he pleaded guilty, and his errors made pleading guilty look *less* enticing than it actually was. Unlike the defendant in *Sanders*, then, Penoncello can credibly claim that, had he received effective assistance from Hunter, he would not have opted to go to trial.

maximum if Penoncello had promptly pleaded guilty, expressed remorse, and spared everyone—especially his victims and the jurors—the burden of trial. At the sentencing hearing, the Court acknowledged that it was imposing "an extremely long sentence," but explained that such a long sentence was warranted given that "Penoncello committed some of the worst crimes that [the Court had ever] seen, and [then] refused to take any responsibility for those crimes." ECF No. 119 at 20-21. The Court went on to lament that although "[t]he evidence against Mr. Penoncello was overwhelming . . . [i]nstead of admitting to [his] crimes . . . Penoncello told pathetic lies to investigators and then, at trial, took the stand and perjured himself by telling a preposterous story about a frame-up that was so complicated that not even the CIA could've pulled it off." *Id.* at 23-24. Had Penoncello pleaded guilty, been honest, and expressed remorse, the Court likely would have imposed a long sentence, but one shorter than 360 months.

For these reasons, the Court finds not only that Hunter's "representation fell below an objective standard of reasonableness," but also "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

## C. Remedy

When fashioning a remedy for a Sixth Amendment violation, a court must seek to "neutralize the taint of [the] constitutional violation," but at the same time must "not

-27-

grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Lafler*, 566 U.S. at 170 (cleaned up). In this case, "resentencing alone will not be full redress for the constitutional injury," *id.* at 171, as were it not for the constitutional violation, Penoncello would have been found guilty of only one count of producing child pornography, instead of two counts of producing and one count of possessing child pornography.

The Court will thus order the government to again offer the initial plea deal, under which Penoncello would plead guilty to one count of production of child pornography, and no other charges would be brought against him. If Penoncello accepts the government's plea offer, pleads guilty to Count 1 of the superseding indictment, and is honest during the change-of-plea hearing, the Court will vacate Penoncello's convictions on Counts 2 and 3 of the superseding indictment, dismiss those counts, and re-sentence him on Count 1.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendant Sean Gerald Penoncello's motion to vacate, set aside, or correct his conviction or sentence under 28 U.S.C. § 2255 [ECF No. 140] is GRANTED IN PART.

2.  The government is ORDERED to reoffer the initial plea deal to Penoncello

    within seven days—that is, to offer to allow Penoncello to plead to one

    count of production of child pornography in violation of 18 U.S.C.

    §§ 2251(a) and (e).

3.  Penoncello is ORDERED to inform the government and the Court whether

    he will accept the government's offer within seven days after receiving

    that offer.  If Penoncello decides to accept the offer, the Court will

    promptly schedule a change-of-plea hearing.

4.  If the Court accepts Penoncello's plea, the Court will order that a revised

    presentence investigation report be prepared, and the Court will set a

    hearing at which Penoncello will be re-sentenced.

Dated:  February 6, 2019                    s/Patrick J. Schiltz
                                           Patrick J. Schiltz
                                           United States District Judge