UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SEAN GERALD PENONCELLO,

Defendant.

Case No. 15-CR-0120 (PJS/LIB)
Civil No. 18-CV-0266 (PJS)

ORDER

Laura M. Provinzino, Benjamin F. Langner, and Katharine T. Buzicky,
UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Robert D. Richman, for defendant.

Defendant Sean Penoncello was convicted after a jury trial of two counts of

producing child pornography and one count of possessing child pornography. He was

sentenced to 400 months' imprisonment. The United States Court of Appeals for the

Eighth Circuit affirmed Penoncello's sentence on direct appeal. *United States v.*

*Penoncello*, 671 F. App'x. 399 (8th Cir. 2016).

Penoncello then filed a motion to vacate, set aside, or correct his sentence under

28 U.S.C. § 2255. Penoncello argued that he received ineffective assistance of counsel

prior to trial—and that, had he received effective assistance, he would have accepted

the government's original plea offer, pleaded guilty to one count of producing child

pornography, and received a shorter sentence. The Court appointed attorney Robert

Richman to represent Penoncello, and the Court conducted an evidentiary hearing at which Penoncello and his original trial counsel testified. Following that hearing, the Court held that Penoncello had indeed received ineffective assistance of counsel, granted his § 2255 motion, and ordered the government to re-offer its original plea agreement. The government did so, Penoncello accepted the government's offer, and the Court held a change-of-plea hearing at which Penoncello pleaded guilty to one count of production of child pornography.

Shortly before Penoncello was to be re-sentenced, the government informed the Court of the existence of recordings of telephone calls made by Penoncello while he was awaiting trial and being detained at the Douglas and Sherburne County Jails. According to the government, those conversations clearly contradicted the testimony that Penoncello gave under oath at the evidentiary hearing on his § 2255 motion—testimony that was the basis for the Court's conclusion that Penoncello received ineffective assistance of counsel. The Court postponed Penoncello's re-sentencing so that it could listen to the recordings of Penoncello's telephone conversations. After reviewing *all* recorded calls (and not just the calls cited by the government), the Court finds it likely that Penoncello committed perjury at the evidentiary hearing and that the testimony on which the Court relied in granting

Penoncello's § 2255 motion was false. The Court therefore orders Penoncello to show cause why the Court should not vacate its order granting his § 2255 motion.

## I. BACKGROUND

Penoncello was indicted on a single count of production of child pornography on April 15, 2015. ECF No. 10. The details of the crime were horrific: The government alleged that a girlfriend of Penoncello's (N.T.) had visited his home on September 15, 2012, with her seven-year-old son (A.M.), her five-year-old daughter (A.L.M.), and an adult friend (S.H.). After N.T. was bitten by Penoncello's dog, S.H. drove her to an emergency room, and the children were left in Penoncello's care. Penoncello took advantage of the unsupervised access to A.L.M. by sexually assaulting her, recording the sexual assault, and distributing images of the sexual assault over the Internet. Two years later, law-enforcement officers discovered images of A.L.M.'s assault on the computer of a suspect in Dayton, Ohio. After an extraordinarily careful and thorough investigation, Special Agent Craig J. Heidenreich of the Federal Bureau of Investigation was able to identify A.L.M. as the victim and Penoncello as the perpetrator.

Attorney Craig Hunter was appointed to represent Penoncello. ECF No. 9. On May 6, 2015—after reviewing the government's original plea offer—Hunter sent a letter to Penoncello advising him that, if he was convicted of producing child pornography as charged in the indictment, he would be facing a mandatory minimum sentence of

15 years' imprisonment.  *See* ECF No. 144-1.  That was true.  *See* 18 U.S.C. § 2251(e).

Hunter also advised Penoncello that the United States Sentencing Guidelines would

recommend a sentence of life in prison.  *See* ECF No. 144-1.  That was not true.  Because

of the statutory maximum, the Guidelines would actually recommend a sentence of

30 years' imprisonment.  *See* 18 U.S.C. § 2251(e); U.S.S.G. § 5G1.1(a).  (For some

defendants, there is no practical difference between 30 years and life, but Penoncello

was only 41 years old at the time.)

At the evidentiary hearing on Penoncello's § 2255 motion, Penoncello swore that

all of the advice that he received from Hunter—whether in person or in writing—was

consistent with the advice contained in Hunter's May 6, 2015 letter.  In other words,

Penoncello testified that Hunter consistently informed him that the minimum term of

imprisonment was 15 years and that the maximum term of imprisonment was life.  *See,*

*e.g.*, ECF No. 162 at 44-48.  Penoncello swore that he was never told that, in fact, his

maximum term of imprisonment was 30 years.  *Id.* at 47.  For his part, Hunter testified

that he had no recollection of ever advising Penoncello that the longest sentence that he

could receive was 30 years.  *Id.* at 12, 14.

On May 26, 2015, Assistant United States Attorney Katharine Buzicky advised

Hunter that Penoncello had until June 3, 2015, to plead guilty to the pending

indictment.  ECF No. 144-2.  Buzicky warned that, if Penoncello did not do so, the

government would seek a superseding indictment that would add a second count of production of child pornography and a count of possession of child pornography. *Id.* Buzicky also warned that, after June 3, any plea deal would require Penoncello to plead guilty to one count of production of child pornography and one count of possession of child pornography. *Id.*

The new charges that the government threatened to bring against Penoncello were based on newly discovered evidence. Specifically, the second production-of-child-pornography count was based on evidence that, months before he recorded himself sexually assaulting A.L.M., Penoncello had recorded himself engaging in sexual intercourse with his son's babysitter (A.O.)—a troubled 14-year-old girl. Penoncello's face does not appear in the videos, but Penoncello's voice is heard, A.O. is heard referring to him as "Sean," and Penoncello's son appears in a portion of one video. The new possession-of-child-pornography charge was based on a large cache of child pornography that law-enforcement officers found at the time of Penoncello's arrest on two thumb drives that had been hidden in a vent in Penoncello's home. Those thumb drives not only contained images and videos of Penoncello's sexual abuse of A.L.M. and A.O., but numerous other images and videos of child pornography. Images and videos of Penoncello's sexual abuse of A.L.M. and A.O. were also found on Penoncello's password-protected smartphone, which he was carrying at the time of his arrest.

Hunter met with Penoncello on May 26, and then again on June 1, to review the evidence and discuss whether Penoncello should accept the government's offer. ECF No. 144 at 2. At the evidentiary hearing on his § 2255 motion, Penoncello swore that, at these meetings, Hunter told him that whether he took a plea deal or not, he would face the same 15-year mandatory minimum and the same maximum sentence (and Guidelines recommendation) of life. ECF No. 162 at 45. In other words, according to Penoncello, Hunter told him that he had nothing to lose by going to trial: His sentencing exposure would be the same—a minimum of 15 years and a maximum (and a Guidelines recommendation) of life—whether he accepted the government's first plea offer, accepted the government's second plea offer, or rejected both plea offers and went to trial. *Id.* at 45-47.

Had Hunter said such a thing to Penoncello,[1] Hunter would have been badly mistaken. Because of the statutory maximums, Penoncello's maximum sentence would be 30 years under the first plea deal (i.e., plead guilty to the one production count in the original indictment); 50 years under the second plea deal (i.e., plead guilty to one production count and one possession count in a superseding indictment); and 80 years if he went to trial and was convicted of the two production counts and the one

---

[1]Hunter testified that he had no specific recollection of advising Penoncello about any of the statutory maximums for the crimes charged in the original or superseding indictments. *Id.* at 14-22.

possession count in the threatened superseding indictment. *See* 18 U.S.C. §§ 2251(e), 2252(b)(2).

To make matters worse, Penoncello testified that not only did Hunter wrongly advise him that his sentencing exposure would not increase if he went to trial, but Hunter never warned him about any of the other negative consequences that would result from going to trial. In fact, Penoncello swore that Hunter told him "that the prosecution would chalk it up as training and that there would be no penalty for going to trial." ECF No. 162 at 45. Hunter did not dispute this claim of Penoncello's,[2] and testified that he could not "specifically" remember ever telling Penoncello that there were any material benefits to pleading guilty (or material detriments to going to trial). Likewise, Hunter testified that he had no "specific" recollection of telling Penoncello that the evidence against him was overwhelming, that he was certain to be convicted, or that, after he was convicted at trial, he would likely face a much longer sentence than if he had pleaded guilty. *See* ECF No. 162 at 25-28.[3] Penoncello swore that, because

---

[2]Hunter was not asked about Penoncello's testimony "that the prosecution would chalk [going to trial] up as training and that there would be no penalty for going to trial." *See* ECF No. 162 at 8-39. But Hunter's affidavit regarding Penoncello's § 2255 motion did not deny this allegation. Instead, Hunter simply noted that he "believe[d that he] told Mr. Penoncello that the fact alone that the case tried would not be the main determining factor in sentencing." ECF No. 144 at 14.

[3] The May 6 letter that Hunter sent to Penoncello was also consistent with Penoncello's testimony. In the letter, Hunter informed Penoncello only that if he did not plead guilty—but instead proceeded to trial—he "would not get the 3-point

Hunter told him that he had absolutely nothing to lose by going to trial, Penoncello rejected the government's plea offers. *See, e.g.*, ECF No. 162 at 46, 49.

Penoncello's trial started on September 21, 2015. The prosecution introduced a mountain of evidence that Penoncello had sexually abused A.L.M., recorded the sexual abuse, and distributed images of the sexual abuse via the Internet; that Penoncello had sexually abused A.O. and recorded it; that Penoncello had maintained a large collection of child pornography in his home and on his smartphone, including depictions of his sexual abuse of A.L.M. and A.O.; that Penoncello had secretly recorded women and girls undressing in the changing room at the AmericInn where he worked; and that Penoncello had lied repeatedly when interviewed by law-enforcement agents before and after his arrest. Both N.T. (A.L.M.'s mother) and A.O. gave credible and moving testimony. The evidence left no doubt that Penoncello was guilty of the crimes charged.

Penoncello defended himself by taking the stand, insisting that he was innocent of any crime, and presenting the theory that he had been framed by a man named "Jesse"—whom, Penoncello said, had been his rival for the affections of a woman

_____

reduction for acceptance of responsibility and would likely have a much harder time convincing the judge he should impose only the [15-year] mandatory minimum." ECF No. 144-1 at 2. Those were the only two benefits of pleading guilty (or consequences of going to trial) explained in Hunter's letter to Penoncello—and, as far as Penoncello was concerned, a three-point reduction in his offense level for accepting responsibility was meaningless, as his offense level would likely be capped at 43 whether he received the three-point reduction or not. ECF No. 162 at 44. (The Court ultimately calculated that, without the cap, Penoncello's offense level would be 51. ECF No. 119 at 5.)

(although Penoncello had never actually met Jesse). *See* ECF No. 114 at 211-39; ECF No. 118 at 7-33. Penoncello's theory was that, in order to get back at him for something or other, Jesse had sexually assaulted A.L.M. in Penoncello's home during the brief window of time on September 15, 2012, when N.T. was at the emergency room,[4] recorded the assault using the same type of smartphone that Penoncello owned at the time, circulated images of the assault on the Internet, and two years later planted photographs and video of the assault on Penoncello's new (password-protected) smartphone. And, apparently fearing that he had not done enough to get Penoncello in trouble, Jesse also managed to persuade the 14-year-old babysitter of Penoncello's son to have sex with Jesse and allow him to record it—and, during the recording, Jesse pulled off a convincing imitation of Penoncello's voice, got A.O. to call him "Sean," and even recorded Penoncello's son at play in his own house. (Nearly three years later, Jesse also planted photographs and video of his encounter with A.O. on Penoncello's new password-protected smartphone.)

---

[4]Penoncello testified that, when N.T. and her children visited him, they had been accompanied not just by S.H., but by other men whom he did not know. Penoncello also testified that, after S.H. took N.T. to the emergency room, Penoncello left his home to help his mother, leaving N.T.'s children alone with N.T.'s other male friends. Penoncello said that, since he did not know what Jesse looked like, one of those male friends could have been Jesse. ECF No. 114 at 222-23; ECF No. 118 at 27. (N.T. and S.H. testified that no men accompanied them to Penoncello's home. ECF No. 114 at 22-23, 25-26, 43.)

Just in case that was not enough, Jesse also took the time to amass a large collection of child pornography, download it to two thumb drives, add images and video of A.L.M. and A.O., and hide the thumb drives in a vent in Penoncello's home. And to put the icing on the cake, Jesse stole some of Penoncello's clothing, wore it while installing a hidden video camera in the women's changing room at the AmericInn (Penoncello's employer), returned the clothing without Penoncello noticing that it had been missing, recorded women and girls taking off their clothes, removed the video camera, copied the recordings to the thumb drives that he later hid in Penoncello's home, and stashed the video camera in Penoncello's vehicle shortly before the police arrested him.

That was Penoncello's defense—a defense that this Court has previously said was "as preposterous a defense as was ever presented in a federal courtroom." *United States v. Penoncello*, 358 F. Supp. 3d 815, 821 (D. Minn. 2019). After three days of trial (and to the surprise of absolutely no one), the jury convicted Penoncello of all charges after a brief deliberation. ECF Nos. 73, 78. The Court sentenced Penoncello to 400 months' imprisonment. ECF No. 99. Penoncello appealed his conviction and sentence, and Hunter filed an *Anders* brief on Penoncello's behalf. Brief for Appellant, *United States v. Penoncello*, 671 F. App'x. 399 (8th Cir. 2016) (No. 16-1711). The Eighth

Circuit rejected all of Penoncello's arguments and affirmed his conviction and sentence. *See United States v. Penoncello*, 671 F. App'x. 399 (8th Cir. 2016).

Penoncello then filed the instant § 2255 motion, arguing that, for several reasons, he had not received effective assistance of counsel from Hunter. *See* ECF Nos. 140, 141, 142. After conducting an evidentiary hearing, the Court granted Penoncello's § 2255 motion based on the Court's holding that Penoncello had received ineffective assistance from Hunter during the plea-bargaining process when Hunter failed to advise him of the statutory maximum penalties he faced and failed to advise him of the benefits of pleading guilty. The Court's holding was based almost entirely on Penoncello's testimony at the evidentiary hearing, as the documentary evidence was scant, and as Hunter had little to say other than that he did not have a specific recollection of most of his conversations with Penoncello.

The Court now turns to the question of whether the recordings of Penoncello's calls from jail as he awaited trial demonstrate that the testimony that Penoncello later gave at the evidentiary hearing was false.

## II. ANALYSIS

As noted, the Court's holding that Penoncello received ineffective assistance of counsel was grounded on two findings: first, the finding that Hunter never provided Penoncello accurate information regarding his sentencing exposure, and second, the

finding that Hunter never advised Penoncello of the material advantages of accepting the initial plea offer. It now appears that both of the Court's findings are belied by Penoncello's recorded jail calls.[5]

### A. Sentencing Exposure

As the Court explained in its prior order, defense counsel has the duty to provide a client with sufficient information about the client's sentencing exposure to allow the client "to make a reasonably informed decision [regarding] whether to accept a plea offer." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992) (citations omitted); *see also United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) (defense counsel has an obligation to "[a]ppris[e] a defendant about his [sentencing] exposure under the sentencing guidelines"); *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) ("A criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.").

---

[5]Penoncello's lawyer (Richman) has filed a motion to strike (1) the letter submitted by the government that informed the Court that there are recordings of Penoncello's jail calls that contradict his testimony, (2) the accompanying FD-302, (3) the document submitted by the government providing excerpts of select jail calls, and (4) the recordings of the underlying jail calls. ECF No. 189. That motion is denied. The Court shares Richman's frustration with the government's lack of diligence, but that frustration is far outweighed by the Court's obligation to protect the integrity of its proceedings.

The Court previously found that Hunter failed in this duty by not giving Penoncello accurate information regarding his sentencing exposure. Specifically, the Court found that while Hunter told Penoncello about the 15-year mandatory minimum, he never told Penoncello about the maximum sentences for any of the crimes with which he was charged. The Court's finding was based on Hunter's May 6 letter to Penoncello, Hunter's lack of specific recollections, and Penoncello's testimony that:

- He lied at his trial "[b]ecause [he] was looking at life" and he "thought [the only way] to get life off would be [to be] acquitted at trial." ECF No. 162 at 43.

- Hunter informed him "that no matter what [he] did, if [he] went to trial or took a plea, that [he] would be still looking at life or the 15-year minimum, no matter if [he] pled or not." ECF No. 162 at 44.

- He believed that the Guidelines range on the first plea deal "w[as] life." ECF No. 162 at 46.

- He was never told that if he accepted the first plea offer the longest sentence that he could receive was 30 years. ECF No. 162 at 47.

- He believed that if the government added charges in a superseding indictment, those additional charges would not matter, as "no matter what it was life or 15 years." ECF No. 162 at 45.

The recordings of Penoncello's jail calls reveal that he was lying—or at least badly mistaken—during his testimony at the evidentiary hearing. For example:

- On April 18, 2015, Penoncello told his brother (Darren) that Hunter had told him "you know, um, the minimum is 15 years and then the maximum is like 30 years." Douglas County Jail Call, April 18, 2015, No. 193809, at 7:56-8:06.

- On May 2, 2015, Penoncello told his mother (Marion) that Hunter had told him that he "can do up to 30 years." Sherburne County Jail Call, May 2, 2015, Index No. 13, at 3:40-4:07.

- Later on May 2, 2015, Penoncello told his stepfather (Rolland) that Hunter "was talking about, you know, I could get 30 years, but if I plead out or whatever then it's only like 15 years, I'd do 13 and a half years . . . ." Sherburne County Jail Call, May 2, 2015, Index No. 14, at 3:25-3:40.

- On May 25, 2015, while urging his brother to circulate a petition on his behalf, Penoncello warned his brother that, if his brother did not help him, he would "spend fucking 30 years in jail, do you understand that?" Sherburne County Jail Call, May 25, 2015, Index No. 74, at 7:45-7:51.

- On May 27, 2015, Penoncello told his mother that "they wanted me to plead something for like 15 to 25 years, and if I don't by Monday it's going to be 15 to 40 years that I'll be looking at." Sherburne County Jail Call, May 27, 2015, Index No. 77, at 1:20-1:35.[6]

---

[6]The 25-year and 40-year maximums to which Penoncello refers are not quite accurate. First, the 25-year maximum should be 30 years (as Penoncello stated in multiple prior phone calls). Second, the 40-year maximum should be 50 years. Throughout this litigation, the parties have mistakenly stated that the possession-of-child-pornography count carried a 10-year statutory maximum, and thus that the second plea offer carried an aggregate 40-year statutory maximum. *See, e.g.*, ECF No. 189 at 9 n.3 (Richman's motion to strike referring to the statutory maximum under the second plea deal as 40 years); ECF No. 162 at 16-25 (Richman repeatedly stating at the evidentiary hearing that the possession count carries a 10-year statutory maximum); ECF No. 87 at ¶ 126 (the PSR stating that the possession count carries a 10-year statutory maximum). As was eventually noted at the evidentiary hearing, because Penoncello possessed child pornography depicting victims under the age of 12, the statutory maximum on the possession count was actually 20 years, not 10 years. *See* ECF No. 162 at 40; *see also* 18 U.S.C. § 2252(b)(2).

The Court also notes that, contrary to Richman's argument (ECF No. 189 at 9 n.3), Hunter could have informed Penoncello of the statutory maximum under the second plea deal by May 27. On May 26, 2015, when Buzicky warned Hunter that

- On May 28, 2015, Penoncello states that he does not "want to spend forever in jail or prison . . . . Well, they're talking 40 years, you know that right? . . . Ya, now they are talking 40 because I wouldn't take that deal . . . the 15 to 25, now it's 15 to 40 . . . ." Sherburne County Jail Call, May 28, 2015, Index No. 78, at 9:13-9:45.

- On June 12, 2015, Penoncello asks his mother if she "think[s] this is a fucking joke? It's not. I'm looking at 40 years [now that I did not take the plea]." Douglas County Jail Call, June, 12, 2015, No. 133411, at 9:20-9:45.

These recordings make clear that Penoncello knew that there was a 30-year statutory maximum penalty under the first plea offer; knew that the statutory maximum would substantially increase as a result of rejecting the first plea offer; and knew that he was not facing a life sentence under either of the plea offers.[7]

---

Penoncello had until June 3 to accept the first plea deal, she informed him what the next deal would be: "After [June 3, Penoncello] will need to plead to possession and production . . . ." *See* ECF No. 144-2.

[7]In Penoncello's motion to strike, Richman argues that Penoncello's jail calls demonstrate that he believed a "life" sentence was possible, citing calls where Penoncello states, for example, that "[Hunter] even said it could be even life, 30 years." ECF No. 189 at 7 (quoting Sherburne County Jail Call, May 12, 2015, Index No. 47, at 0:48-0:55). Having listened to all of the recorded jailhouse calls, however, the Court is confident that Penoncello is not referring to an actual life sentence, but to the fact that, as a *practical* matter, a 30-year sentence will (in his words) be "my whole life pretty much." Sherburne County Jail Call, May 10, 2015, Index No. 39, at 10:00-10:12 (". . . I could do a year or something, but not 15, not, not my whole life pretty much, and your whole life, and [my son] would be grown . . . ."); Douglas County Jail Call, June, 25, 2015, No. 104402, at 11:02-11:20 ("That's my life you're talking about though. 40 years in prison, um no . . . no I don't think so . . .").

*B. Consequences of Going to Trial*

In its order granting Penoncello's § 2255 motion, the Court also explained that defense counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (quoting *Libretti v. United States*, 516 U.S. 29, 50-51 (1995)). This means that defense counsel should inform a client about the "relevant circumstances" surrounding a potential plea, including the material risks of declining a plea deal and proceeding to trial. *Herrera*, 412 F.3d at 580. "A defendant cannot make an intelligent choice about whether to accept a plea offer unless he fully understands the risks of proceeding to trial." *Id.* (citing *Teague v. Scott*, 60 F.3d 1167, 1171 (5th Cir. 1995)).

The Court previously concluded that Hunter failed in this duty by never advising Penoncello of the material advantages of accepting the initial plea offer, or the material disadvantages of proceeding to trial. Instead, Hunter led Penoncello to believe that he would not suffer any negative consequences by rejecting the plea offers and choosing to go to trial—save the fact that he would not get a (meaningless) three-point reduction for acceptance of responsibility and he "would likely have a much harder time convincing the judge he should impose only the [15-year] mandatory minimum." ECF No. 144-1 at 2. The Court also found that Penoncello was never told that the evidence against him was overwhelming, that he was certain to be convicted, and that

the sentence that he would receive after being convicted at trial would likely be substantially longer than the sentence that he would receive after pleading guilty. The Court based its findings, once again, on Hunter's May 6 letter to Penoncello, Hunter's lack of "specific" recall of conversations with Penoncello, and Penoncello's testimony that:

- Hunter told him that going to trial would not have an impact on his sentence. ECF No. 162 at 48.

- Hunter "told [him] that the prosecution would chalk it up as training and that there would be no penalty for going to trial." ECF No. 162 at 45.

- Hunter never discussed with him whether he was likely to be convicted by a jury. ECF No. 162 at 48.

- Instead of Hunter advising Penoncello that he would surely be convicted by a jury, Hunter "encourage[d]" Penoncello's preposterous Jesse-framed-me defense, and gave Penoncello hope that he would be acquitted. ECF No. 162 at 48.

Once again, the recordings of Penoncello's jail calls reveal that he was lying to the Court. For example:

- On May 7, 2015, Penoncello explained to his mother that Hunter told him that "if I fight it then I'll be looking at way more time." Penoncello continued: "That's what he said . . . he said the best day is 15 years, but if I fight it it could be way more and stuff, and he's like they they don't want to go through a trial either or anything so . . . ." Sherburne County Jail Call, May 7, 2015, Index No. 29, at 12:15-13:00.

- Also on May 7, 2015, Hunter described for Penoncello the mountain of evidence against him, including the pornographic images of children that were found on his iPhone; the thumb drives containing pornographic

images of children found in his home; and the fact that photos of Penoncello's son were also found on both the iPhone and thumb drives. Hunter informed Penoncello that the "best case" scenario for him would be a 15-year sentence. Sherburne County Jail Call, May 7, 2015, Index No. 29, at 6:28-7:20, 12:50-14:05.

- On May 8, 2015, in a conversation with his stepfather, Penoncello recounted his May 7 conversation with Hunter, explaining that he had "talked to [his] attorney yesterday and he basically said yeah I'm screwed and this and that and something about a thumb drive and he's like yeah you'll be lucky if you see 15 years." Sherburne County Jail Call, May 8, 2015, Index No. 32, at 3:13-3:25.

- On May 12, 2015, Penoncello told his mother that he just got done talking to Hunter, who had "nothing good" to say, and "he was basically telling me I was guilty." "[He said] there's a ton of evidence against me . . . a ton." Penoncello stated that Hunter told him that if "[he] took it to court that [he] would be found guilty and that [he] would be looking at way more time." Sherburne County Jail Call, May 12, 2015, Index No. 45, at 0:20-1:20.

- On May 16, 2015, Penoncello said that Hunter told him "you know, well, we can bring this to trial, but I guarantee you're going to lose. That's what he said." Sherburne County Jail Call, May 16, 2015, Index No. 58, at 16:18-16:30.

- On June 12, 2015, Penoncello told his mother that he had tried out his "I-was-framed" defense on Hunter, "but [Hunter] said the jury is not gonna believe me." Douglas County Jail Call, June, 12, 2015, No. 133411, at 10:36-11:10.

- On June 25, 2015, Penoncello again conveyed to his mother that Hunter had told him that his case was weak, explaining that "my attorney says like, um, the jury is gonna be . . . . I don't know, he's like well that's quite some circumstance [referring to the I-was-framed defense] and stuff like that, and the jury the jury is gonna question or something, I don't know . . . he said he's gonna question my story." Penoncello added that "[e]very

time I talk to [Hunter] he scares me."  Douglas County Jail Call, June, 25, 2015, No. 104402, at 2:35-3:15.

- Also on June 25, 2015, Penoncello's mother asked him why he is worried, and he responded "cuz they seem like they have a lot of stuff against me." He continued that he "just want[s his] attorney to say okay we have a good case, you know?"  Douglas County Jail Call, June, 25, 2015, No. 104402, at 6:00-6:50, 8:40-8:47.

- Finally, on June 29, 2015, Penoncello said that he "asked [Hunter] what kind of case do we have, and he's like we have a really hard one." Douglas County Jail Call, June, 29, 2015, No. 145544, at 1:48-1:56.

Far from telling Penoncello that he had nothing to lose by going to trial, Hunter repeatedly told Penoncello that he would likely receive a longer sentence if he did not plead guilty but instead decided to "fight" the case.  And far from encouraging Penoncello to persist in his "I-was-framed-by-Jesse" defense, Hunter pointed out holes in the defense[8] and told Penoncello that a jury would not believe it.  In fact, Penoncello complained to his mother that Hunter *refused* to tell him that he "ha[d] a good case" but instead told him that his defense was not believable and that a jury would surely convict him.

---

[8]*See, e.g.*, Douglas County Jail Call, June, 29, 2015, No. 145544, at 2:14-2:30 (Penoncello telling his mother about how Hunter asked him why someone would frame him by *hiding* fabricated evidence in his house, and complaining that Hunter was making Penoncello "come up with [his] whole defense").

In short, the recordings of Penoncello's jail calls make clear that he perjured himself at the evidentiary hearing—or at least that he has an atrocious memory.[9]  Either way, however, the recordings of Penoncello's pretrial telephone conversations leave no doubt that Hunter *did* inform Penoncello of the statutory maximums that he faced, Hunter *did* inform Penoncello that he had no chance of winning at trial, and Hunter *did* inform Penoncello that he would likely receive a longer sentence if he proceeded to trial.

*     *     *

The Court's order granting Penoncello's § 2255 motion remains interlocutory, as the Court has not yet re-sentenced Penoncello.  *See Andrews v. United States*, 373 U.S. 334, 340 (1963) ("Where, as here, what was appropriately asked and appropriately granted was the resentencing of the petitioners, it is obvious that there could be no final disposition of the § 2255 proceedings until the petitioners were resentenced."); *see also United States v. Futch*, 518 F.3d 887, 894 (11th Cir. 2008) ("[W]e conclude that Futch's § 2255 proceedings were not completed and final until the district court resentenced

---

[9]The Court notes that, even putting aside Penoncello's testimony at the evidentiary hearing, Penoncello has proven himself to be extremely dishonest.  He told many lies to law-enforcement officers, and he perjured himself at his criminal trial.  He also tried to persuade others to perjure themselves at his criminal trial.  *See, e.g.*, Sherburne County Jail Call, May 28, 2015, Index No. 78, at 4:35-4:52; Douglas County Jail Call, June 12, 2015, No. 133411, at 2:05-4:50 and 9:10-11:45; Douglas County Jail Call, June 25, 2015, No. 104402, at 12:14-14:38.

him on June 26, 2006.").  Thus, the Court has the inherent power to reconsider its order.

*See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995)

("The district court has the inherent power to reconsider and modify an interlocutory

order any time prior to the entry of judgment." (citation omitted)).[10]  The Court also has

a duty to protect the integrity of its own proceedings, irrespective of the interests of the

parties.[11]

For these reasons, Penoncello is ordered to show cause why the Court should not

vacate its prior order granting (in part) his § 2255 motion.

_____

[10]Even if the Court had entered a final judgment, "a district court can grant relief from a judgment pursuant to Rule 60(b) *sua sponte*."  *Pierson v. Dormire*, 484 F.3d 486, 491 (8th Cir. 2007), *vacated in part on reh'g*, 276 F. App'x 541 (8th Cir. 2008).

[11]In a related context, the Supreme Court has explained:

> This historic power of equity to set aside fraudulently
> begotten judgments is necessary to the integrity of the
> courts, for tampering with the administration of justice in
> this manner involves far more than an injury to a single
> litigant.  It is a wrong against the institutions set up to
> protect and safeguard the public.  Moreover, a court has the
> power to conduct an independent investigation in order to
> determine whether it has been the victim of fraud.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (cleaned up).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Penoncello's motion to strike [ECF No. 189] is DENIED.

2.    Penoncello must SHOW CAUSE why the Court should not vacate its prior

order granting his motion under 28 U.S.C. § 2255 [ECF No. 171].

3.    Penoncello's brief must be no longer than 6,000 words and must be filed

by September 30, 2019.

4.    The government may respond to Penoncello by October 14, 2019.  Any

brief filed by the government must be no longer than 6,000 words.

Dated:  August 30, 2019                          s/Patrick J. Schiltz
                                                 Patrick J. Schiltz
                                                 United States District Judge