UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Case No. 15-CR-0120 (PJS/LIB)
                                             Civil No. 18-CV-0266(PJS)

                          Plaintiff,

v.                                                        ORDER

SEAN GERALD PENONCELLO,

                          Defendant.

---

      Katharine T. Buzicky, Laura M. Provinzino, and Benjamin F. Langner,
UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

      Robert D. Richman, for defendant.

      Defendant Sean Penoncello was convicted by a jury of two counts of production

and one count of possession of child pornography and sentenced to 400 months'

imprisonment.  Penoncello later filed a motion to vacate, set aside, or correct his

sentence under 28 U.S.C. § 2255.  The Court appointed counsel for Penoncello and

conducted an evidentiary hearing, at which Penoncello and his trial counsel testified.

The Court granted Penoncello's § 2255 motion in an order dated February 6, 2019, after

concluding that Penoncello had received ineffective assistance of counsel during plea

negotiations.

      The government subsequently submitted additional evidence to the Court.  This

evidence appeared to show that Penoncello had given false testimony at the evidentiary

hearing and that the factual premises of the Court's February 2019 order were untrue.
After reviewing this evidence, the Court ordered Penoncello to show cause why the
February 2019 order should not be vacated.  The parties submitted briefing, and the
Court held a second evidentiary hearing on July 30, 2020.

For the reasons that follow, the Court vacates its February 2019 order and denies
Penoncello's § 2255 motion.

## I.  BACKGROUND

The facts of this case have been extensively discussed in this Court's prior orders.
*See* ECF Nos. 171, 190, 194.  To very briefly summarize:

On April 15, 2015, Penoncello was indicted on a single count of production of
child pornography.  ECF No. 10.  The underlying facts were horrific.  Penoncello
sexually assaulted a frightened five-year-old girl who was briefly left in his care when
her mother (Penoncello's girlfriend) was taken to an emergency room after being bitten
by one of Penoncello's dogs.  Penoncello used his smart phone to record his assault of
the girl and then distributed the recording over the Internet.  Attorney Craig Hunter
was appointed to represent Penoncello.  ECF No. 9.

On May 26, 2015, Assistant United States Attorney Katharine Buzicky informed
Hunter that the government intended to seek a superseding indictment based on newly
discovered evidence that Penoncello had recorded his sexual abuse of a second minor

-2-

and possessed a large cache of child pornography.  ECF No. 144-2.  The superseding

indictment would charge two counts of production and one count of possession of child

pornography.  Buzicky also advised that if Penoncello wished to plead guilty to the

original (single-count) indictment, he must do so before June 3, 2015.  After that,

Buzicky warned, any plea deal would require Penoncello to plead guilty to one count of

production and one count of possession of child pornography.

If Penoncello had accepted the government's first plea offer and pleaded guilty

to one count of production, he would have faced a 15-year mandatory minimum and a

30-year statutory maximum.  *See* 18 U.S.C. 2251(e).  If Penoncello had accepted the

government's second plea offer and pleaded guilty to one count of production and one

count of possession, he would have faced the same 15-year mandatory minimum, but

his statutory maximum would have increased to 50 years.  *See* 18 U.S.C. § 2252(b)(2).

And if Penoncello rejected both offers, went to trial, and was convicted of all three

counts, he would face a 15-year mandatory minimum and an 80-year statutory

maximum.

Hunter met with Penoncello on a number of occasions to discuss a possible plea.

During every conversation with Hunter, Penoncello adamantly insisted that he was

innocent and that he would not plead guilty to any charge.  *See* ECF No. 144 at 1–7.  As

promised, Buzicky went back before the grand jury, and the grand jury returned the three-count superseding indictment on June 9, 2015.  ECF No. 27.

Two months later, Buzicky again contacted Hunter and informed him that the government's pending offer—allowing Penoncello to plead guilty to one count of production and one count of possession—would remain open until August 31, 2015. ECF No. 144-3.  After that, Buzicky said, Penoncello would have to go to trial or plead "straight up"—that is, plead to all three counts in the superseding indictment without any concessions from the government.  *Id.*  Penoncello again insisted on his innocence and again declined to plead guilty.  The case proceeded to trial.

At trial, the government introduced a mountain of evidence of Penoncello's guilt, including testimony from one victim's mother, direct testimony from another victim, and video evidence of Penoncello's crimes.  Penoncello took the stand and told the jury that he was innocent of any wrongdoing, and that he had been framed by a man named "Jesse."  Penoncello testified that he had never met Jesse, but that Jesse had nonetheless planned and executed an extraordinarily complex scheme over a multi-year period to make it look like Penoncello had produced, distributed, and possessed child pornography.  Penoncello's story was ridiculous, and, following a brief deliberation, the jury found him guilty on all counts.  ECF Nos. 73, 78.

At that point, Penoncello was facing a 15-year mandatory minimum and an 80-year maximum sentence.  Penoncello's recommended sentence under the United States Sentencing Guidelines would have been life in prison, but the recommendation was capped at 960 months because of the statutory maximum.  *See* U.S.S.G. § 5G1.1(a).[1]  The government sought a sentence of 480 months, Penoncello sought a sentence of 180 months (the mandatory minimum), and the Court imposed a sentence of 400 months.  ECF Nos. 89, 90, 99.  The United States Court of Appeals for the Eighth Circuit affirmed Penoncello's conviction and sentence on direct appeal.  *United States v. Penoncello*, 671 F. App'x 399 (8th Cir. 2016).

On January 25, 2018, Penoncello filed a pro se motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[2]  Penoncello continued to maintain his innocence and argued, among other things, that he had received ineffective assistance of counsel because Hunter had not competently advised him with respect to plea negotiations and because Hunter had not introduced any mitigating evidence at his

---

[1]At the time that Penoncello was sentenced, the government, the defense, the probation officer, and the Court all mistakenly believed that the statutory maximum was 840 months (70 years) rather than 960 months (80 years).  Everyone overlooked the fact that, because Penoncello possessed child pornography depicting minors under the age of 12, the statutory maximum on the possession count was 20 years rather than 10 years.  *See* 18 U.S.C. § 2252(b)(2).  (The statutory maximum for each of the two production counts was 30 years, for a total of 80 years.)

[2]Penoncello's pro se motion is dated January 25, 2018 and was docketed January 29, 2018.  ECF No. 140.

sentencing hearing.[3]  The Court appointed attorney Robert Richman to represent

Penoncello and held an evidentiary hearing on September 20, 2018.  ECF Nos. 148, 155.

(Throughout this order, the Court will refer to this as the "first evidentiary hearing.")

Both Penoncello and Hunter testified at the hearing.  Based on that testimony and on

the other evidence introduced at the hearing, the Court found that Hunter's

representation during the plea-bargaining process fell below professional standards.

ECF No. 171.  The Court further found that if Penoncello had been competently

advised, there was a reasonable probability that he would have pleaded guilty to the

original, single-count indictment and would have received a shorter sentence.  To

remedy the constitutional violation, the Court ordered the government to re-offer the

first plea deal and allow Penoncello to plead guilty to a single count of production of

child pornography.  The government did so, and Penoncello pleaded guilty on

March 29, 2019.  ECF No. 173.  A re-sentencing hearing was scheduled for July 30, 2019.

ECF No. 174.

Just a few days before the scheduled re-sentencing hearing, the government

notified the Court that, in preparation for the hearing, the case agent had listened to

recordings of calls that Penoncello had placed from jail between May 1 and June 30,

---

[3]Penoncello raised a number of other claims in his pro se motion, but both
Penoncello and his attorney confirmed on the record at the September 2018 evidentiary
hearing that Penoncello was no longer pursuing those claims.  ECF No. 162 at 3–6.

2015.  ECF No. 191-1 at 1–9.  The government provided a summary of those calls to the

Court and argued that the calls showed that Penoncello had either lied or been badly

mistaken when he testified at the evidentiary hearing.  After receiving the government's

summary, the Court postponed the re-sentencing hearing and asked the government to

submit the recordings of Penoncello's jail calls so that the Court could listen to the

recordings itself rather than rely on the government's summary.  *See id.* at 10–11.

Three days later, Penoncello filed a motion to strike the jail calls and the

government's summary of them.  ECF No. 189.  The Court denied the motion and

issued an order to show cause why its February 2019 order granting Penoncello's § 2255

motion should not be vacated.  ECF No. 190.  After receiving briefing from both parties,

the Court held another evidentiary hearing on July 30, 2020.  ECF No. 204.  (Throughout

this order, the Court will refer to this as the "second evidentiary hearing.")  Based on

the testimony and evidence received at that hearing, the Court now vacates its February

2019 order and denies Penoncello's § 2255 motion.

## II.  ANALYSIS

### A.  *Vacatur of February 2019 Order*

As this Court has previously explained, its February 2019 order granting

Penoncello's § 2255 motion is interlocutory, and this Court "has the inherent power to

reconsider and modify" that order at "any time prior to the entry of judgment."  *Murr*

*Plumbing, Inc. v. Scherer Brothers Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995); *see* ECF

No. 194 at 16–26.

The February 2019 order was grounded on three factual findings:

First, Hunter failed to inform Penoncello of the statutory maximums and

mistakenly advised Penoncello that the Sentencing Guidelines recommended a sentence

of life.  Thus, Penoncello was led to believe that, regardless of whether he pleaded

guilty or went to trial, he would face a mandatory minimum of 15 years and a

maximum of life.

Second, Hunter not only failed to advise Penoncello that rejecting the

government's initial plea offer would increase his sentencing exposure by 50 years

(from 30 years under the original indictment to 80 years under the superseding

indictment), but Hunter failed to advise Penoncello of other negative consequences of

going to trial, such as the impact on the judge of hearing from Penoncello's victims,

watching video of his crimes, and witnessing Penoncello perjure himself.

Third, Hunter failed to advise Penoncello that the evidence against him was

overwhelming, that no reasonable jury would believe his "Jesse-framed-me" defense,

and that he was certain to be convicted at trial.

These factual findings were, for the most part, based on Penoncello's testimony

at the first evidentiary hearing.  In light of the evidence introduced at the second

evidentiary hearing, the Court now finds that the testimony given by Penoncello at the first evidentiary hearing was false and that the factual findings underlying the February 2019 order are not true.

1.  Sentencing Exposure

At the first evidentiary hearing, Penoncello testified that Hunter told him that regardless of whether he (1) pleaded guilty to one count of production under the first plea offer, (2) pleaded guilty to one count of production and one count of possession under the second plea offer, or (3) was convicted of all three counts at trial, his sentencing exposure would be exactly the same: a mandatory minimum of 15 years and a maximum (and Guidelines recommendation) of life imprisonment.[4]  *See* ECF No. 162 at 44–47.  Penoncello testified that he therefore believed that he had nothing to lose by going to trial.  *Id.* at 44–45 ("[L]ooking at life, I thought—and with nothing to lose, I thought we had to go to trial.  It was the only way to get life off.").  Penoncello's account was bolstered by a May 6, 2015 letter from Hunter, in which Hunter told Penoncello

---

[4]Technically, Penoncello testified that he believed that the second plea offer would require him to plead to two counts of production (rather than one count of production and one count of possession), and would carry a 15-year mandatory minimum and Guidelines recommendation of life imprisonment.  ECF No. 162 at 46–47.  Penoncello's misunderstanding of the terms of the second plea offer was not material to the Court's analysis in the February 2019 order.  Hunter stated in a sworn affidavit that he correctly advised Penoncello that the second plea offer would require him to plead to one count of production and one count of possession, and the Court credits Hunter's account.  ECF No. 144 at 6–7.

that if he was convicted of one count of producing child pornography as charged in the original indictment, the sentence recommended by the Guidelines "would be life."  ECF No. 144-1 at 2.

In reality, if Penoncello had accepted the government's initial plea offer and pleaded guilty to one count of production, the statutory maximum (and Guidelines recommendation) would have been 30 years.  *See* 18 U.S.C. § 2251(e); U.S.S.G. § 5G1.1(a).  At the first evidentiary hearing, Penoncello swore that, had he known that the longest sentence he could receive was 30 years, he would have accepted the government's initial plea offer.  ECF No. 162 at 49.  Indeed, Penoncello testified that he was "dying to" admit that he was guilty of producing child pornography, and that the only reason he didn't plead guilty was that he feared a life sentence.  *Id.* at 50.

Although the Court had doubts about Penoncello's testimony, there was no evidence contradicting him.  Hunter was the only other witness who testified at the first evidentiary hearing.  As a witness (and as an attorney), Hunter is both honest and literal.  When asked a question such as "do you recall shaking hands with your client on December 17?," he tends to answer "no" or "not specifically" unless, as he sits on the stand, he can actually pull up a memory of shaking his client's hand on December 17.  Unlike most witnesses, Hunter does not answer such questions by saying things like, "I'm sure I did, as I always shake hands with my clients when I meet with them."  And

thus, because Hunter—like most lawyers—cannot recall every word that he said to clients years ago, his testimony at the first evidentiary hearing about his communications with Penoncello mostly consisted of him saying that he could not specifically recall whether or not he had said particular things to Penoncello.

This was true with respect to the 30-year statutory maximum.  Hunter testified at the first evidentiary hearing that he could not specifically remember discussing the 30-year maximum—or any of the other statutory maximums—with Penoncello.  ECF No. 162 at 11–14.  In the absence of any evidence contradicting Penoncello's claim that he was never told about the maximums, the Court found in its February 2019 order that Hunter performed deficiently in failing to inform Penoncello of the statutory maximums and therefore failing to inform Penoncello of the increased sentencing exposure that he would face if he did not accept the government's plea offers.

As it turns out, Hunter did tell Penoncello about the statutory maximums.  The jail calls and other evidence introduced at the second evidentiary hearing leave no doubt that Penoncello was well aware of the 30-year statutory maximum at the time that he declined the government's initial plea offer.

### a.  Jail Calls & Hunter's May 2015 Memorandum

At the second evidentiary hearing, the government introduced recordings of calls placed by Penoncello from jail between March 28 and August 11, 2015.  Gov. Exs. 3–23.

In those calls, Penoncello repeatedly demonstrated that he knew that under the original indictment—which, again, charged him with a single count of production of child pornography—the longest sentence that he could receive is 30 years. As early as April 18, 2015—11 days after Hunter was appointed to represent him—Penoncello told his family that "the minimum is 15 years and then the maximum is like 30 years." Gov. Ex. 3, No. 193809 at 7:56–8:06; *see also* Gov. Ex. 9, May 25, 2015 ("I need to get that stuff going otherwise I am going to spend fucking 30 years in jail. Do you understand that?"). And on multiple occasions, Penoncello specifically reported that *Hunter* had told him that the maximum sentence was 30 years. *See* Gov. Ex. 6, May 2, 2015 ("[the] last time [my attorney] . . . came to see me . . . [he said] you can do up to 30 years"); Gov. Ex. 7, May 2, 2015 ("[My attorney] is talking about you know I could get 30 years."); Def. Ex. 7, May 12, 2015 at 0:50 ("my attorney said it could be even life, 30 years"). On a couple of occasions, Penoncello incorrectly referred to the statutory maximum for production of child pornography as 25 years. *See* Gov. Ex. 10, May 27, 2015 ("They wanted me to plead to something, for like 15 to 25 years, and if I don't by Monday, it's gonna be 15 to 40 years that I'll be looking at."); Gov. Ex. 11, May 28, 2015 ("Now they're talking 40 [years] because I wouldn't take that deal, the . . . 15 to 25, now it's 15 to 40."). The record provides no explanation for why Penoncello did so, but the

record is absolutely clear that—contrary to Penoncello's claim at the first evidentiary

hearing—Penoncello was well aware that he was not facing a life sentence.

At the second evidentiary hearing, the government also introduced into evidence

a memorandum that Hunter prepared in May 2015 on the subject of Penoncello's

sentencing exposure.  Gov. Ex. 24.  Hunter testified that he prepared this memo after the

government advised that it intended to seek a superseding indictment if Penoncello did

not plead guilty to the original indictment.  ECF No. 209 at 90–92.  This memo was not

produced at the first evidentiary hearing.  At that time, Hunter had forgotten that the

memo existed, and due to a filing irregularity Hunter did not locate the memo when he

reviewed his files in search of documents relevant to Penoncello's § 2255 motion.  It was

only after Richman reviewed Hunter's 2015 billing records in preparation for the second

evidentiary hearing and brought to Hunter's attention an entry referring to Penoncello's

sentencing exposure that Hunter was able to locate the memo.  *Id.* at 87–90, 104–05.

At the time he prepared the memo, Hunter's discussions with the government

led him to believe "that there might be two superseding indictments"—one that would

charge one count of production and one count of possession, and a second that would

be returned shortly before trial and charge two counts of production and one count of

possession.  *See id.* at 92.  Hunter's memo reflects this understanding, and in three bullet

points it sets out the charges and statutory minimum and maximum sentences under

-13-

the original and then-anticipated first superseding and second superseding indictments.

Gov. Ex. 24. The government ultimately sought just one superseding indictment

charging two counts of production and one count of possession, but offered to allow

Penoncello to plead guilty to one count of production and one count of possession.

Buzicky's May 26, 2015 email to Hunter confirmed that intent, and Hunter testified that

when he met with Penoncello to go over the memo, he explained Penoncello's options

as modified by Buzicky's May 26 email. *See* ECF No. 144-2; ECF No. 209 at 92. In other

words, Hunter explained to Penoncello that there would be just one superseding

indictment charging three counts, and that if he chose to plead guilty after June 3, he

would have to plead to two of those three counts.[5]

Hunter's May 2015 memo explains that "[u]nder the present, one-count

indictment, [Penoncello] is subject to a mandatory 15-year sentence and a maximum of

30 years." Gov. Ex. 24. The memo goes on to explain that if Penoncello were convicted

of one count of production and one count of possession, the production charge would

carry a maximum 30-year sentence and the possession charge would carry an

"additional" maximum 10-year sentence. *Id.* (As noted above, Hunter and everyone

else involved in this case overlooked the fact that, because Penoncello possessed child

---

[5]Penoncello's testimony and affidavit confirm that Hunter advised him that there would be just one superseding indictment charging two counts of production and one count of possession. *See* ECF No. 209 at 125; ECF No. 142 ¶ 7.

pornography depicting minors under the age of 12, the statutory maximum on the possession count was actually 20 years.  18 U.S.C. § 2252(b)(2); ECF No. 27.)  Finally, the memo explains that if Penoncello were convicted of two counts of production and one count of possession, each production count would carry a 15- to 30-year sentence, "which the court could order be served either concurrently, that is at the same time, or consecutively, that is one . . . after the other, in addition to any penalty for the possession."  Gov. Ex. 24.  Hunter testified that his "best belief" is that he sat down with Penoncello and "went over" this memo.  ECF No. 209 at 105–06.

### b. July 2020 Testimony

Although Hunter had testified at the first evidentiary hearing that he could not specifically remember discussing the statutory maximums with Penoncello, Hunter testified at the second evidentiary hearing that his memory had been refreshed by reviewing his May 2015 memo and by reading the Court's show-cause order (which quoted several of Penoncello's jail calls).  ECF No. 209 at 81–83, 86–87, 96.  His memory having been refreshed, Hunter testified that he believed that he had explained to Penoncello that the statutory maximum would be 30 years under the first plea deal.  *See id.* at 82–83.

Although Penoncello had testified at the first evidentiary hearing that he was never told of the statutory maximum, Penoncello acknowledged at the second

evidentiary hearing that his prior testimony had not been accurate.  Peoncello admitted that he was wrong when he testified at the first hearing that Hunter told him that regardless of whether he pleaded guilty or went to trial, he was looking at a maximum sentence of life.  *Id.* at 125–26.  Peoncello testified that Hunter had informed him that "the government had a plea offer from 15 to 25 years and if I did not take it, they were going to supersede indict me with another charge of production and a charge of possession."  *Id.* at 125.

Accordingly, the first of the three factual premises for the Court's February 2019 order—that Hunter did not advise Peoncello about the statutory maximums, leading Peoncello to believe that he would be facing 15 years to life whether or not he accepted the government's plea offers—is clearly not true.

## 2.  Sentencing Impact

The second factual premise for the Court's February 2019 order was that Hunter failed to advise Peoncello that going to trial would not only increase his exposure, but likely result in a longer sentence.  The Court explained:

> Hunter also never warned Peoncello of the likely impact on his *sentence* if he went to trial.  As any experienced criminal defense attorney knows, the cost of going to trial is not just the loss of a three-point reduction in the offense level for acceptance of responsibility.  The cost is also that the judge (who has tremendous discretion in setting a sentence) will sit in the courtroom with the defendant, hour after hour, immersed in evidence about the horrible things the

defendant has done.  That cost is compounded when victims
or their loved ones take the stand and tell the judge about
the often devastating impact of the defendant's actions.  That
cost is compounded even further when the defendant takes
the stand, swears to tell the truth, and then perjures himself.
That cost is compounded yet further when the defendant
attacks his victims or their family members.  And then, at the
sentencing hearing, neither the defendant nor his attorney is
likely to be able to give an effective allocution, as both have
to maintain the pretense that the defendant did not commit a
crime.  It is difficult for a defendant to express remorse for
something that he claims not to have done.

ECF No. 171 at 17–18.

At the first evidentiary hearing, Penoncello testified that Hunter told him that

going to trial rather than pleading guilty "wouldn't change [his] sentence."  ECF

No. 162 at 48.  According to Penoncello, Hunter told him that "the prosecution would

chalk it up as training and that there would be no penalty for going to trial."  *Id.* at 45.

Lending credence to Penoncello's testimony was the fact that, in his March 2016

sentencing memorandum, Hunter had urged the Court to find that Penoncello's

decision to go to trial "is not a basis for a substantially increased sentence" because the

trial "gave the attorneys and lead agent invaluable experience in the preparation and

presentation of these cases."  ECF No. 94 at 2.

In his May 6, 2015 letter to Penoncello (which was introduced at the first

evidentiary hearing), Hunter explained that if Penoncello did not plead guilty and was

convicted at trial, Penoncello would have a much harder time convincing the judge to

impose the mandatory minimum, and Penoncello would not receive a three-point

reduction for acceptance of responsibility.  ECF No. 144-1 at 2.  Hunter testified at the

first evidentiary hearing that he could not "recall specifically discussing [the negative

consequences of going to trial] with Mr. Penoncello beyond that."  ECF No. 162 at 26.

Based on Penoncello's testimony and the lack of evidence contradicting it, the Court

found that Hunter failed to "inform Penoncello that the best way to minimize his

sentence was to tell the truth, plead guilty, and accept responsibility for what he had

done," but instead advised him that "'there would be no penalty for going to trial.'"

ECF No. 171 at 18 (quoting ECF No. 162 at 45).

Once again, Penoncello's jail calls contradict the sworn testimony that he gave at

the first evidentiary hearing.  As those calls make clear, Hunter did in fact advise

Penoncello—many times—that if he went to trial and was convicted, he would receive a

substantially longer sentence than if he pleaded guilty.  *See* Gov. Ex. 8, May 12, 2015

("[Hunter] said if I took it to court that I would be found guilty and I would be looking

at way more time.").[6]  At the second evidentiary hearing, Hunter clarified his prior

---

[6]*See also* Gov. Ex. 3, Apr. 9, 2015, No. 200416 at 1:00–1:17 ("[My attorney said]
'you're looking at 15 years minimum, you'd have to do 12 and a half years and then like
well the last 6 months you can serve, go in a halfway house if you–if you, um say you
did it.  But if [they find you guilty after trial] you're looking at decades in prison.'");
Gov. Ex. 6, May 2, 2015 ("Last time I was talking to [Hunter] . . . he was like you know,
um, you can do up to 30 years and you know if we fight it . . . that just makes 'em
mad."); Gov. Ex. 7, May 2, 2015 ("[My attorney is] talking about you know I could get
(continued...)

testimony and explained that he had "discuss[ed] with [Penoncello] that the penalties were very likely to be more severe if he were to try the case and be convicted as compared to pleading guilty."  ECF No. 209 at 84.  Hunter also testified that he "told [Penoncello] repeatedly that if he had done this [i.e., committed the crimes charged]—I didn't accuse him of lying to me or being guilty, but I would tell him if you did this, you are much better off taking responsibility and then you can talk to the Court about that."  *Id*. at 84–85.

Accordingly, the second of the three factual premises for the Court's February 2019 order—that Hunter did not advise Penoncello that going to trial would likely result in a longer sentence—is clearly not true.

### 3.  Likelihood of Acquittal

The third factual premise for the Court's February 2019 order was that Hunter failed to warn Penoncello that the evidence against him was overwhelming, that his planned defense was absurd, and that he was virtually certain to be found guilty.  The Court based this finding on Penoncello's testimony at the first evidentiary hearing that Hunter never warned him that he would lose if he went to trial.  To the contrary, swore

---

[6](...continued)

30 years, but if I plead out or whatever then it's only like 15 years, I'd do 13 and a half years."); Gov. Ex. 4, May 7, 2015, Index 29 at 12:22–12:53 ("[Hunter] said if I fight then I'll be looking at way more time . . . he said the best day is 15 years, but if I fight it could be way more and stuff, and he's like they, they don't want to go through a trial either or anything so.").

Penoncello, Hunter encouraged his "Jesse-framed-me" defense, expressed optimism about his chances at trial, and told Penoncello that he had recently won an acquittal for a defendant.  ECF No. 162 at 44, 48.

Hunter's testimony at the first evidentiary hearing was not to the contrary. Hunter testified that he "[could not] say" that he ever told Penoncello that it was in his best interest to plead guilty, given the strong evidence against him.  ECF No. 162 at 27. Instead, Hunter explained that he had tried to review the evidence with Penoncello, and he hoped that Penoncello would draw his own conclusions about the improbability of his being acquitted at trial.  *Id*. at 27–28.

Once again, though, the jail calls introduced at the second evidentiary hearing directly contradict the testimony given by Penoncello at the first evidentiary hearing. For example, in a May 7 phone call, Penoncello said that Hunter told him, "[i]t's not good . . . he said it looks really bad, he said it looks really, really bad . . . and like my luckiest day would be 15 years."  Gov. Ex. 4, Index 29 at 1:06–1:58.  When asked by his mother whether he told Hunter that he was innocent, Penoncello responded that he had, but that Hunter told him that the evidence clearly showed that he was guilty.  *Id*. at 9:49–10:07.  One day later, Penoncello said that he "talked to [his] attorney yesterday and he basically said yeah I'm screwed and this and that and something about a thumb drive and he's like yeah you'll be lucky if you see 15 years."  Gov. Ex. 4, Index 32

at 3:13–3:25.  Just a few days later, on May 12, Penoncello told his mother that he had

just talked to Hunter, who had "nothing good" to say, and "he was basically telling me

I was guilty. . . . He said there's a ton of evidence against me . . . a ton."  Gov. Ex. 8; *see*

*also* Def. Ex. 7, May 12, 2015 at 10:12–10:22 ("[Hunter] kept going off like I did it.  He

doesn't even believe me I didn't do it.").  And just a few days after that, Penoncello said

that Hunter had told him "we can bring this to trial, but I guarantee you're going to

lose."  Gov. Ex. 4, May 16, 2015, Index 58 at 16:18–16:30.

Penoncello points to several other jail calls in which either Penoncello or one of

his family members referred to Hunter being optimistic about Penoncello's chances at

trial.[7]  For example, on June 29, 2015, Penoncello told his stepfather that Hunter said,

"it's a hard case but looking at everything, he's like you know, the jury could say you're

not guilty.  He's like everything kinda adds up to you're not guilty.  But it's a hard

case."  Gov't Ex. 22 at 9:29–9:44.  The other examples that Penoncello cites are

statements that his family members made in an effort to keep his spirits up.  For

example, Penoncello's brother told him at one point that their stepfather had reported

---

[7]Penoncello cites these examples primarily in support of his argument that, unless the government can prove that Penoncello intentionally lied at the first evidentiary hearing, the Court's February 2019 order cannot be disturbed.  *See* ECF No. 213 at 19–20.  Penoncello argues that rather than intentionally lie to the Court, he simply remembered the positive and forgot about the negative.  As explained below, though, the Court need not find that Penoncello intentionally lied in order to set aside its prior order.  And as also explained below, the Court believes that Penoncello did intentionally lie at the first evidentiary hearing.

that Hunter thought Penoncello had "nothing to worry about."  Def. Ex. 14, Apr. 24,

2015 at 10:57–11:11.[8]

The Court does not believe that these calls provide credible evidence that Hunter

was expressing optimism about Penoncello's chances of being acquitted at trial.  For one

thing, the evidence against Penoncello was so overwhelming that no sane and honest

attorney (and Hunter is both) would have told Penoncello or anyone else that

Penoncello had a good chance of being acquitted.  For another, the statements to which

Penoncello now points have to be put in context:  Penoncello was an emotional wreck

during the months following his arrest.  During tear-filled calls with family members,

he suffered frequent emotional breakdowns and complained bitterly about how

difficult things were for him in jail.  He begged his family to bring him good news or to

say something to give him hope.  Penoncello's family members did their best, but their

_____

[8]Penoncello also cites the following calls:  Def. Ex. 12, Apr. 11, 2015 at 3:10–3:26 (Penoncello telling his mother that his brother talked to his stepfather who said that his attorney said "it looks really good or something"); Def. Ex. 13, Apr. 15, 2015 at 4:38–4:48 (Penoncello's mother encouraging him to "just hang in there 'cause your attorney sounds pretty optimistic"); Def. Ex. 4, May 5, 2015 at 0:30–0:55, 10:18–10:25 (Penoncello's mother telling him that he might be coming home, which Penoncello questioned, asking, "but my lawyer actually said that though?"); Def. Ex. 5, May 5, 2015 at 1:58–2:08 (Penoncello asking "you're sure you're not lying about my attorney, what he said?" to which his mother responds, "no no no no everything is Kosher"); Def. Ex. 6, May 6, 2015 at 2:30–2:43 (Penoncello asking "when you talked to my attorney yesterday did he sound positive I would be home soon?" to which his mother responds "yes," Penoncello says, "I hope so," and his mother says, "I hope so too"); Def. Ex. 10, July 31, 2015 at 0:28–0:40 (Penoncello's mother states that she "talked to that [defense] investigator today and he sounds pretty positive that you're gonna get out of there").

choice of words and the tone of their voices made their attempts to cheer Penoncello far

from convincing.  Penoncello himself seemed to suspect that they did not always

believe what they were saying.  *See, e.g.*, Def. Ex. 5, May 5, 2015 at 1:58–2:08 ("you're

sure you're not lying about my attorney, what he said?").

And even if Hunter had expressed optimism to Penoncello's family

members—which, as noted, the Court doubts—that does not change the fact that the jail

calls provide clear evidence that Hunter repeatedly told *Penoncello* that he would lose if

he went to trial.  The jail calls also make clear that, far from encouraging Penoncello's

"Jesse-framed-me" defense, Hunter did his best to talk him out of it.  In a June 12, 2015

phone call, Penoncello told his mother that he had discussed his proposed defense with

Hunter and that Hunter had responded by saying that the jury would not believe it.

Gov. Ex. 3, Index 133411 at 10:36–10:55; *see also* Gov. Ex. 3, June 25, 2015, Index 104402

at 2:33–2:57 ("And my attorney says like, um, the jury is gonna be um I don't know, he's

like well that's quite some circumstance and stuff like that, and the jury is gonna

question or something, I don't know . . . he said he's gonna question my story."); Gov.

Ex. 3, June 29, 2015, Index 145544 at 2:07–2:50 (Penoncello tells his mother that Hunter

asked him why someone would frame him by hiding fabricated evidence in his house,

and complaining that Hunter was making Penoncello "come up with [his] whole

defense").

In short, the third of the three factual premises for the Court's February 2019 order—that Hunter did not advise Penoncello that he would almost certainly be convicted if he went to trial—is clearly not true.

### 4. Showing Required to Set Aside Interlocutory Order

As the Court has explained, all three of the major factual premises for its decision to grant Penoncello's § 2255 motion have been proven false, as Penoncello largely concedes.  But Penoncello nevertheless argues that the Court cannot set aside its prior order unless it finds that he intentionally lied at the first evidentiary hearing.  It is not enough, Penoncello argues, that his prior testimony was mistaken or based on a faulty memory.  Only if the government can prove that Penoncello affirmatively and intentionally lied to the Court may the Court's prior order be disturbed.

This does not make sense as a policy matter, and the Court is unaware of any authority that suggests that it is true as a legal matter.  As this Court has previously explained, the February 2019 order granting Penoncello's § 2255 motion was an *interlocutory* order—not a final judgment—and the Court retains inherent authority to revise or revoke that order in the interests of justice.  *See, e.g., United States v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000) ("[B]ecause the district court's order granting Martin's § 2255 motion was not final, the district court had inherent jurisdiction to modify, alter, or revoke it."); *Hernandez v. United States*, No. 16-CV-22657, 2016 WL 8078310, at *1 (S.D.

Fla. Dec. 7, 2016) ("Until resentencing, the Order [granting petitioner's § 2255 motion] is an interlocutory order that the Court has the inherent authority to reconsider."). The Federal Rules of Civil Procedure that apply to setting aside or revising final judgments do not apply to the February 2019 order because it was not a final judgment. *Compare* Fed. R. Civ. P. 59, 60 (applicable to motions to alter or amend or for relief from a final judgment), *with* Fed. R. Civ. P. 54(b) (explaining that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment").

The Court agrees with Penoncello that its inherent authority to set aside interlocutory orders must be exercised with restraint and discretion. At the same time, Penoncello did not acquire a vested interest in a mistaken interlocutory order. This Court's ultimate responsibility is to see that justice is done. This Court issued an interlocutory order that gave Penoncello relief to which he was not entitled based on testimony that was at worst perjurious and at best wildly inaccurate. The Court rejects Penoncello's argument that the Court must leave in place such an interlocutory order unless the Court finds that Penoncello committed perjury.[9] (In any event, as the Court

---

[9] "[The Supreme] Court has long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). In *Dietz*, the Supreme Court

(continued...)

will explain below, the Court *does* believe that Penoncello committed perjury at the first evidentiary hearing.)

Penoncello next argues that the Court should not set aside its prior order based on evidence that could have been presented at the first evidentiary hearing, had the

--------

[9](...continued)
described two limiting principles that guide courts in the exercise of inherent powers: "First, the exercise of an inherent power must be a 'reasonable response to the problems and needs' confronting the court's fair administration of justice," and second, "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Id.* at 1892 (internal citations omitted). Among the inherent powers explicitly recognized by the Supreme Court in *Dietz* is the power to rescind or modify an interlocutory order:

> [A] district court ordinarily has the power to modify or rescind its orders at any point prior to final judgment in a civil case. *Marconi Wireless Tel. Co. of Am. v. United States*, 320 U.S. 1, 47–48 (1943); *see also* Fed. R. Civ. P. 54(b) (district court can revise partial final judgment order absent certificate of finality); *Fernandez v. United States*, 81 S. Ct. 642, 644 (1961) (Harlan, J., in chambers) (district court has inherent power to revoke order granting bail).

*Id.* at 1892. In this case, the Court finds that exercising its inherent authority to vacate an interlocutory order is a "reasonable response to the problems and needs confronting the court's fair administration of justice." Indeed, failure to invoke the Court's inherent authority in this instance would cause Penoncello to enjoy a benefit procured through his own admittedly incorrect testimony. Further, the Court is not aware of any "rule or statute" that expressly limits the Court's authority to modify its interlocutory order. *See also United States v. Marcos-Quiroga*, 478 F. Supp. 2d 1114, 1129 (N.D. Iowa 2007) ("The court has no doubt that it has the inherent authority to reconsider, in its discretion and even *sua sponte*, its ruling on Marcos-Quiroga's motion to withdraw his guilty plea where the interest of justice would be served, even though no rule or statute expressly permits such reconsideration.").

government exercised due diligence.  The Court shares Penoncello's frustration with the government's lack of diligence, which has not only inflicted hardships on Penoncello and his counsel, but created a great deal of work for the Court.  The key evidence—the recordings of Penoncello's jail calls—was available to the government long before the first evidentiary hearing, and the government has offered no explanation for why the jail calls were not brought to the Court's attention at that hearing.  *See* ECF No. 209 at 70–71.

Penoncello argues that disturbing the Court's prior order on the basis of belatedly produced evidence is unfair and gives the government a "second bite of the apple."  ECF No. 213 at 22.  As noted, the Court sympathizes with Penoncello's argument, but the Court does not believe that the cost of the government's lack of diligence should be affording Penoncello relief to which he is not entitled and that he obtained only because he gave false testimony under oath.  The Court is loathe to leave in place an interlocutory order that it knows to be incorrect and unjust, and Penoncello's conduct has been far more egregious than the government's.[10]

---

[10]Again, Rule 60(b)(2) does not apply to this case, and thus the Court is not restricted to acting on the basis of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  The Court is acting pursuant to its inherent authority, under which it may set aside its own interlocutory orders to ensure the "fair administration of justice." *Dietz*, 136 S. Ct. at 1892.

Although the facts and procedural posture of this case are unusual, at least one district court faced with similar circumstances vacated an interlocutory order granting a § 2255 motion after learning of newly produced but previously discoverable evidence. In *Diaz v. United States*, No. 3:94CR00026 (AVC), No. 3:97CV00719 (AVC), 2007 U.S. Dist. LEXIS 89757 (D. Conn. Dec. 5, 2007), petitioner Scott Diaz filed a § 2255 motion arguing that he had received ineffective assistance of counsel based on his attorney's failure to challenge the predicate offenses that formed the basis for his sentencing enhancement under the Armed Career Criminal Act ("ACCA"). The government identified four prior convictions for violent felonies or serious drug offenses, even though the ACCA requires just three predicate offenses for the enhancement to apply. Diaz argued—and extrinsic evidence seemed to show—that he had not been represented by counsel when he pleaded guilty to one of the predicate offenses. *Id.* at *5–6. Diaz also testified at an evidentiary hearing on his § 2255 motion that he did not remember appearing in court in connection with another of the four predicate convictions—specifically, a weapons charge based on conduct that occurred while he was incarcerated. *Id.* at *10–11. In response, the government offered into evidence the judgment mittimus from the weapons conviction, but the section of the document that required a certification that the defendant appeared in court was blank. *Id.* at *11–12. Further testimony established that some inmates had been sentenced by that court

in absentia, and that the prison where Diaz was incarcerated did not receive the

judgment until the day after it was issued, even though a judgment typically "travels

with the convict" (and thus, if Diaz had appeared in court, the prison should have

received the judgment on the same day that it was issued). *Id.* at *12.

Based on this evidence, the district court granted Diaz's § 2255 motion, vacated

the ACCA enhancement, and ordered the government to show cause why Diaz should

not be released pending a re-sentencing hearing. *Id.* at *13–14. Two days later, the

government moved for reconsideration based on "recently discovered information."

That "information" was a docket sheet showing that Diaz had been represented in

connection with the weapons charge and an affidavit from the sentencing judge stating

that, as far as the judge could remember, Diaz had appeared in court and been

represented by counsel. *Id.* at *14–15. The court granted the government's motion for

reconsideration and vacated its order granting § 2255 relief, explaining that:

> Although the government fails to justify its failure to present
> this evidence at the [evidentiary] hearing, the court will not
> require a justification—as exceptional circumstances are
> presented here, that is, evidence which is not offered simply
> for impeachment and which, standing alone, appears like a
> club to defeat any claim that the petitioner has been
> constitutionally aggrieved. Accordingly, the court will
> authorize a reopening of the record in this matter.

*Id.* at *16. The court held a second evidentiary hearing at which the docket sheet was

offered into evidence. The court then denied the § 2255 motion, concluding that "newly

furnished evidence" had "clearly demonstrated that the earlier ruling was in error." *Id.*
at *43–44.

Like the district court in *Diaz*, this Court finds that "newly furnished evidence"
conclusively establishes that its interlocutory order granting Penoncello's § 2255 motion
was "in error" because it was based on factual premises that were not true.
Accordingly, the Court vacates that order and reconsiders Penoncello's § 2255 motion in
light of the full record, as supplemented at the second evidentiary hearing.

### B. Reconsideration of § 2255 Motion

Penoncello asserts that, for two reasons, he did not receive the effective
assistance of counsel. First, Penoncello argues that Hunter failed to adequately advise
Penoncello during plea negotiations. And second, Penoncello argues that Hunter failed
to introduce any mitigating evidence at his sentencing hearing.

Claims of ineffective assistance of counsel are evaluated under the two-part test
set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prove that he was deprived
of the effective assistance of counsel, Penoncello must establish both that Hunter's
performance was deficient and that Penoncello was prejudiced by the deficiency. *Id.*
at 687. Counsel's performance is deficient if it falls below an objective standard of
reasonableness, as determined by reference to prevailing professional norms and all
relevant circumstances. *Id.* at 687–88; *Sinisterra v. United States*, 600 F.3d 900, 906

-30-

(8th Cir. 2010).  To establish prejudice, Penoncello "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  The Supreme Court has cautioned that "[s]urmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002) ("[A] court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." (citation omitted)).

### 1.  Plea Negotiations

A criminal defendant is entitled to the effective assistance of counsel during the plea-bargaining process.  *Lafler v. Cooper*, 566 U.S. 156, 162 (2012).  In particular, defense counsel is "constitutionally required" to provide advice about "the sentence that the plea will produce, the higher sentence that conviction after trial might entail, and the chances of such a conviction.  Such matters fall within 'the range of competence demanded of attorneys in criminal cases.'"  *Padilla*, 559 U.S. at 390 (Scalia, J., dissenting) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)); *see also United States v. Herrera*, 412 F.3d 577, 580 (5th Cir. 2005) ("A defendant cannot make an intelligent choice about

whether to accept a plea offer unless he fully understands the risks of proceeding to trial."); *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) ("A criminal defendant has a right to expect at least that his attorney will . . . explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available."). With one possible exception, the Court finds the Penoncello received the effective assistance of counsel during the plea-bargaining stage of his case.

First, the Court finds that Hunter adequately advised Penoncello that the evidence against him was overwhelming, that no reasonable jury would believe his "Jesse-framed-me" defense, and that he was almost certain to be convicted at trial. Hunter testified at both the first and second evidentiary hearings that he repeatedly reviewed the evidence with Penoncello in order to impress upon him "how strong the case against him was."  ECF No. 209 at 86; *see also* ECF No. 162 at 27–28.  The jail calls make clear that Hunter's discussions with Penoncello had the desired effect.[11]  Without

---

[11]*See, e.g.*, Gov. Ex. 4, May 8, 2015, Index 32 at 3:13–3:25 ("I talked to my attorney yesterday and he basically said yeah I'm screwed and this and that and something about a thumb drive and he's like yeah you'll be lucky if you see 15 years."); Gov. Ex. 4, May 16, 2015, Index 58 at 16:18–16:30 ("My attorney said, he's like 'you know, well, we can bring this to trial, but I guarantee you're going to lose.'  That's what he said.").

Penoncello testified at the second evidentiary hearing that in the weeks leading up to trial Hunter became "optimistic."  ECF No. 209 at 130.  Hunter testified that, to the contrary, as trial drew near and the evidence against Penoncello mounted, Hunter became even more pessimistic about Penoncello's likelihood of success at trial.  ECF No. 162 at 32.  The Court finds that Hunter's testimony is credible, and that Penoncello's

(continued...)

question, Penoncello understood that, in Hunter's opinion, the evidence against him was overwhelming and he was virtually certain to be convicted at trial.

Second, the Court finds that Hunter adequately advised Penoncello of the impact that going to trial would have on his sentence.  In its February 2019 order, the Court was troubled by evidence that Hunter had failed to advise Penoncello that taking his case to trial would jeopardize his ability to obtain a favorable sentence because (1) the judge would spend several days immersed in evidence of his crimes, including video recordings of his abuse of two minors, live testimony from one of those minors, and live testimony from the mother of the other minor; (2) Penoncello would take the stand and give testimony that the judge would almost surely regard as perjurious; and (3) Penoncello would be foreclosed from taking responsibility or expressing remorse for his crimes, making it difficult for either him or his attorney to give an effective allocution at sentencing.  The jail calls make clear, however, that Hunter did advise Penoncello that there was a substantial cost to be paid for electing to go to trial.[12]

---

[11](...continued)
testimony is not.

[12]*See, e.g.,* Gov. Ex. 3, Apr. 9, 2015, No. 200416 at 1:00–1:13 ("[Hunter told me] 'you're looking at 15 years minimum, you'd have to do 12 and a half years and then like well the last 6 months you can serve, go in a halfway house if you– if you, um say you did it.  But if [they find you guilty after trial] you're looking at decades in prison."); Gov. Ex. 8, May 12, 2015 ("[Hunter] said if I take it to court that I would be found guilty and that I would be looking at way more time.").

Further, Hunter credibly testified that he told Penoncello that if he were guilty, the best thing he could do was to admit his guilt and accept responsibility for his crimes.  ECF No. 209 at 84–85.

Penoncello points out that there is still no evidence that Hunter specifically advised him that perjuring himself at trial or causing the judge to see and hear the evidence against him was likely to result in a longer sentence.  *See* ECF No. 209 at 111–12, 130.  But "[j]udicial scrutiny of counsel's performance must be highly deferential"; in reviewing an ineffective-assistance claim, a court's function is not to impose a specific script that defense counsel must follow.  *Strickland*, 466 U.S. at 689. Indeed, courts must not prescribe any "particular set of detailed rules for counsel's conduct," as "[a]ny such set of rules would interfere with the constitutionally protected independence of counsel."  *Id.* at 688–89; *see also id.* at 690 ("Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.").

In this case, Penoncello clearly understood that if he took his case to trial, he would likely receive a much longer sentence than if he pleaded guilty (and not just because of the increased statutory maximum).  Penoncello also knew that he was guilty, and Hunter had advised Penoncello that, if he were guilty, the best thing he could do

was accept responsibility for his crimes.  *See* ECF No. 209 at 84–85.  The fact that Hunter

could have advised Penoncello about the cost of going to trial more emphatically or

specifically does not mean that his representation was constitutionally deficient.

Defendants are different, and a defense attorney must be free to tailor his or her

approach to the unique characteristics of his client.  Like all defense counsel, Hunter

had to, on the one hand, ensure that Penoncello made a fully informed decision about

whether to plead guilty and, on the other hand, ensure that Penoncello's decision was

his own and not the product of coercion from his attorney.  The jail calls reflect that the

relationship between Penoncello and Hunter was already somewhat fractured due to

Hunter's attempts to overcome Penoncello's willful blindness to the strength of the case

against him.  *See, e.g.*, Def. Ex. 8, May 13, 2015 at 7:58–9:25.  Hunter had to tread

carefully.  The Court finds that Hunter competently fulfilled his responsibility to advise

Penoncello about the costs of going to trial in a way that ensured that Penoncello made

his own decision.

Finally, the Court finds that Hunter adequately advised Penoncello about the

statutory maximums and the increased exposure of going to trial, with one exception:

Hunter correctly advised Penoncello that if convicted of all three counts at trial, his

sentence on each count could be imposed consecutively, and that the statutory

maximum for both production counts was 30 years.  However, Hunter incorrectly

advised Penoncello that the statutory maximum for the possession count was 10 years,

when in fact it was 20 years.  *See* 18 U.S.C. § 2252(b)(2).

The Court finds that Hunter otherwise adequately advised Penoncello about his

sentencing exposure.  True, Hunter incorrectly advised Penoncello in a May 6, 2015

letter that if he pleaded guilty or were convicted under the original indictment, the

Guidelines would recommend life imprisonment.  ECF No. 144-1.  But Hunter later

corrected that error and explained that the single count of production of child

pornography charged in the original indictment carried a statutory maximum of

30 years.  The jail calls leave no doubt that Penoncello understood that his maximum

sentence was 30 years and not life.[13]

_____

[13]The jail calls reveal that Penoncello knew of the 30-year statutory maximum as
early as April 18.  *See* Gov. Ex. 3, No. 193809 at 7:56–8:06 (Penoncello stating that Hunter
told him "the minimum is 15 years and then the maximum is like 30 years"); *see also*
Gov. Ex. 6, May 2, 2015 ("[the] last time [my attorney] . . . came to see me . . . [he said]
you can do up to 30 years").  Hunter met with Penoncello to discuss a possible guilty
plea on May 12, 2015.  ECF No. 144 at 1, 6.  That same evening, Penoncello told his
mother, "my attorney said it could be even life, 30 years."  Def. Ex. 7 at 0:50.

On a couple of occasions, Penoncello told a family member that he was looking
at a "life" sentence.  *See* Def. Ex. 8, May 13, 2015 at 8:25–8:30 ("[Hunter] told me I better
take a plea otherwise I could be looking at life in jail."); Def. Ex. 9, May 14, 2015 at 12:10
("My attorney is telling me I could be facing life.").  It appears, though, that Penoncello
was referring to the *practical* effect of a long sentence on someone of his age.  *See* Gov.
Ex. 21, June 25, 2015 ("That's my life we're talking about though—forty years in
prison—um no I don't think so.").  Penoncello testified at the second evidentiary
hearing that he meant "literally life, not that it's a long time," ECF No. 209 at 125, but
the Court does not credit the truthfulness of Penoncello's testimony.  Both before and

(continued...)

Hunter also advised Penoncello that if he declined to plead guilty to the original indictment by June 3, 2015, the government would seek a superseding indictment charging two counts of production and one count of possession of child pornography. ECF No. 144 at 6.  Hunter told Penoncello that, after June 3, any plea deal would require Penoncello to plead guilty to one count of production and one count of possession.  *Id.* at 6–7.  Hunter told Penoncello that his statutory maximum would increase to 40 years, reflecting Hunter's mistaken belief that the production charge carried a maximum sentence of 10 years.  *See* ECF No. 209 at 82–83, 110.  Hunter did not correct this error prior to trial.

Penoncello argues that rather than (or perhaps in addition to) advising him that his statutory maximum under the second plea deal would be 40 years, Hunter advised him that 40 years was the statutory maximum if he were convicted at trial.  Penoncello contends that, in the days after Hunter met with him to discuss the superseding indictment, Penoncello related to his family on multiple jail calls that, because he had declined to plead guilty to the original indictment, his statutory maximum had increased to 40 years.  *See* Gov. Ex. 10, May 27, 2015 ("They wanted me to plead to something, for like 15 to 25 years, and if I don't by Monday, it's gonna be 15 to 40 years

---

[13](...continued)
after making these remarks, Penoncello made clear that he understood that his maximum sentence was not life, but 30 years.  *See, e.g.*, Gov. Exs. 6, 9.

that I'll be looking at."); Gov. Ex. 11, May 28, 2015 ("Now they're talking 40 [years]

because I wouldn't take that deal, the . . . 15 to 25, now it's 15 to 40."); Gov. Ex. 16,

June 12, 2015 ("I'm looking at 40 years."); Gov. Ex. 21, June 25, 2015 ("That's my life

we're talking about though—forty years in prison—um no I don't think so.").

     Hunter testified that he understood Penoncello's repeated references to

"40 years" to refer to Penoncello's sentencing exposure under the *second plea offer*, not

his sentencing exposure if he *went to trial*.  ECF No. 209 at 110.  In other words, because

Penoncello did not plead guilty prior to June 3, he would have to plead guilty to one

count of production and one count of possession, which Penoncello had been told

would expose him to a 40-year maximum sentence.

     Penoncello disputes Hunter's interpretation.  At the second evidentiary hearing,

Penoncello testified that he understood that 40 years would be the statutory maximum

if he were convicted of all counts at trial.  ECF No. 209 at 127.  The Court does not

believe his testimony for several reasons:

     First, Penoncello is extremely dishonest, and since the day he was arrested, he

has proven himself willing to say whatever he believes will help his cause, whether it is

true or not.  He lied to investigators.  He lied to his own attorney.  He took the stand at

his own trial and perjured himself—repeatedly and ridiculously.  He lied in his pro se

§ 2255 motion.  And then he lied under oath at the first evidentiary hearing.  At that

hearing (it will be recalled), Penoncello swore that he was never advised of any statutory maximum, that Hunter told him that no matter what he did he was facing a maximum sentence of life, and that, had he known that accepting the government's original plea offer would expose him to only a 30-year sentence, he would have accepted that offer—in fact, he was "dying to" plead guilty.  ECF No. 162 at 43–50.  This testimony was so far from the truth that Penoncello had to know that it was false.

When evidence came to light that Penoncello *had* been advised of the 30-year maximum, he changed his story.  No longer was he "dying to" plead guilty and deterred from doing so only by the prospect of a life sentence.  Now Penoncello claims that he took his case to trial because he believed that he was facing a maximum sentence of only 40 years.  ECF No. 209 at 128.  In other words, Penoncello is now claiming that he was willing to try his case because he believed his worst-case scenario was being imprisoned for 40 years (until he was nearing age 80)—but he would have pleaded guilty if he'd known that his worst-case scenario was being imprisoned for 80 years.  Penoncello is habitually dishonest, and his testimony is simply not credible.[14]

_____

[14]Penoncello argues that if the Court finds that Penoncello lied at the first evidentiary hearing, it must also find that Hunter lied.  *See* ECF No. 213 at 20 ("The jail calls fail to establish that Mr. Penoncello lied, any more than they establish that Mr. Hunter lied."); *id.* at 17 ("The government's position seems to be that Mr. Hunter's incorrect statements were a product of innocent misrecollection, while Mr. Penoncello's identical mistakes were intentional lies.  That position is irrational and fundamentally unfair.").  That is not true.  At the first evidentiary hearing, Hunter mostly testified

(continued...)

Second, Hunter's May 2015 memo provides strong evidence that Hunter advised Penoncello that under the *second plea deal* the longest sentence he could receive was 40 years, but that the longest sentence that he could receive *if convicted at trial* was 70 years—that is, consecutive sentences of 30, 30, and 10 years. (Again, Hunter was mistaken about the 10 years.) Paragraph two of Hunter's May 2015 memo explains that if convicted of one count of production and one count of possession of child pornography, Penoncello would face "a maximum of 30 years on the producing and a maximum additional 10 years on the possession." Gov. Ex. 24. In paragraph three, Hunter explains that if convicted of two counts of production and one count of possession, "[t]he maximum sentence on each of the producing counts would be 30 years, and because there are separate victims, whatever sentence imposed could be

---

[14](...continued)
about his lack of *memory*; there is no reason to believe that Hunter was lying about his lack of memory just because his memory was refreshed prior to the second evidentiary hearing. By contrast, Penoncello did not claim a lack of memory. To the contrary, he testified—emphatically and with apparent certainty—about what *happened*, and the things he said were later proven to be not even close to the truth. There is ample reason to believe that Penoncello was lying. *Compare* ECF No. 162 at 14 (Hunter: "It's true I don't have a recollection as I sit here today of [telling Penoncello that the statutory maximum was 30 years]."), *and id.* at 16–17 (Hunter, in response to a question about whether he told Penoncello that his Guidelines range was life: "I don't have a present recollection of exactly what I said. That may have been what I told him, yes."), *with id.* at 47 (Richman: "Did Mr. Hunter ever tell you that if you pleaded guilty to the original indictment, the most time that you could receive was 30 years?" Penoncello: "No, he did not."), *and id.* at 49 (Richman: "[I]f you had understood that you were facing a range of 15 to 30 years, rather than 15 years to life, what would you have done?" Penoncello: "I would've pled.").

imposed concurrently or consecutively"—"concurrently" meaning "at the same time" and "consecutively" meaning "one . . . after the other, in addition to any penalty for the possession." *Id.* Penoncello knew that he had in fact been charged by superseding indictment with three counts—two counts of production and one count of possession. ECF No. 142 ¶ 7. Penoncello also knew that after June 3, 2015, the government's second plea offer would allow him to plead guilty to two counts. ECF No. 162 at 46–47; ECF No. 144 at 6–7.

Penoncello claims, however, that until it was produced in connection with the July 2020 hearing, he had never seen Hunter's 2015 memo. ECF No. 209 at 128. Hunter explained that Penoncello did not keep the memo because Penoncello did not want any papers with him in jail that might disclose to other inmates the nature of the crimes with which he was charged. *Id.* at 105. But when Hunter was asked by defense counsel whether he had ever "actually showed" the memo to Penoncello, Hunter testified, "I would presume that I did because it was meant for him. And my best belief is that we sat down and went over it." *Id.* at 105–06. Hunter further testified that he took the time to define terms like "consecutive" and "concurrent" precisely because he intended to show the memo to Penoncello; he would not have needed to define those terms for himself. *Id.* at 90–91.

The Court credits Hunter's testimony that he "sat down and went over" his May 2015 memo with Penoncello and gave Penoncello advice that was consistent with its terms. That memo and Hunter's advice made clear to Penoncello that, if he accepted the government's second plea offer, his statutory maximum would be 40 years, and if he went to trial and was convicted of all counts, his statutory maximum would be 70 years. The Court therefore rejects Penoncello's testimony that Hunter told him that, if he went to trial and was convicted of all counts, his statutory maximum would be 40 years.

That leaves Hunter's one uncorrected error. Hunter indisputably told Penoncello that the maximum sentence on the possession count was 10 years, when in fact it was 20 years because the child pornography that Penoncello possessed depicted minors under the age of 12. As a result, Penoncello was led to believe that if he accepted the second plea offer, he would be facing a sentence of 15 to 40 years, when in fact he would be facing a sentence of 15 to 50 years. And Penoncello was led to believe that if he was convicted of all counts at trial, he would be facing a sentence of 15 to 70 years, when in fact he would be facing a sentence of 15 to 80 years.

As the Court has explained, everyone involved in the case—including the government, the probation officer, and the Court—made the same mistake as Hunter. The Court will nevertheless assume (somewhat sheepishly) that Hunter's failure to

inform Penoncello of the correct statutory maximum sentence on the possession count fell below an objective standard of reasonableness. That is not the end of the inquiry, however.

To succeed on his ineffective-assistance claim, Penoncello must show not just that Hunter's "representation fell below an objective standard of reasonableness," but "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. In the context of this case, Penoncello "must demonstrate a reasonable probability [that he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 147 (2012). A "reasonable probability" does not mean "more likely than not," but it does mean "more than a possibility." *Paul v. United States*, 534 F.3d 832, 837 (8th Cir. 2008) (citation and quotation marks omitted).

Again, Hunter's error was that he told Penoncello that the longest sentence that he could receive on the production count was 10 years when in fact it was 20 years, and thus that the longest sentence that he could receive if he went to trial was 70 years when in fact it was 80 years. Even Penoncello does not claim that this mistake caused him not to accept the government's plea offers. Penoncello was 41 years old when he was indicted. A 70-year sentence would mean that he would be released from prison at the age of 100 (assuming credit for good behavior). An 80-year sentence would mean that

he would be released from prison at the age of 109. Both sentences were effectively life

sentences. Clearly, then, Penoncello suffered no prejudice because Hunter mistakenly

believed the maximum sentence on the production count to be 10 years.

It also bears noting that from the moment that law-enforcement officers

questioned Penoncello until the moment that it became clear to him that he could not

receive § 2255 relief without admitting guilt, Penoncello adamantly insisted that he was

innocent and that he would never plead guilty. As this Court described in its

February 2019 order:

> Penoncello did not simply deny his guilt, but he did so
> repeatedly and vociferously (sometimes with tears in his
> eyes). He seemed terrified at the thought of going to prison,
> and he seemed eager to grasp at any straw. Even in his
> § 2255 motion, Penoncello continued to deny his guilt,
> suggesting that, had he been competently advised, he could
> have entered a plea of nolo contendere to the
> child-production charge in the original indictment. ECF
> No. 141 at 10–11.

ECF No. 171 at 19–20 (footnote omitted).[15] Penoncello insisted that he was innocent

when interviewed by law enforcement before his arrest, when interviewed by law

enforcement after his arrest, in privileged conversations with Hunter, in sworn

testimony to the jury, on appeal, and in his pro se § 2255 motion. "A defendant who

---

[15]Indeed, Penoncello was so desperate to escape punishment for his crimes that
he asked his family to call the Governor and the President on his behalf. *See, e.g.*, Gov.
Ex. 4, May 10, 2015, Index 39 at 10:15–10:30 ("You know what else you could do . . . call
the Governor or the President even and ask him. It's worth a shot.").

maintains his innocence at all the stages of his criminal prosecution and shows no

indication that he would be willing to admit his guilt undermines his later § 2255 claim

that he would have pleaded guilty if only he had received better advice from his

lawyer." *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003); *see also Allen v. United*

*States*, 854 F.3d 428, 432–33 (8th Cir. 2017) (affirming dismissal without a hearing of

ineffective-assistance claim based on finding that defendant, who eventually pleaded

guilty, could not establish a reasonable probability that he would have accepted an

earlier, more favorable plea deal if he had been competently advised).

For these reasons, the Court finds that Penoncello has not established a

reasonable probability that, but for Hunter's error, Penoncello would have accepted

either of the government's plea offers.

## 2.  Sentencing

Penoncello next argues that he received ineffective assistance of counsel at the

sentencing stage because (1) Hunter failed to bring Penoncello's attempted cooperation

in a high-profile case to the Court's attention and (2) Hunter failed to investigate or

present any mitigating evidence regarding Penoncello's difficult childhood.  The

Supreme Court has never specifically described the standards that apply to ineffective-

assistance claims arising out of noncapital sentencing proceedings, but the Eighth

Circuit has cited the guidelines of the American Bar Association as useful "guides to

determining what is reasonable." *Slocum v. Kelley*, 854 F.3d 524, 533 (8th Cir. 2017) (citation and quotation marks omitted).  In particular, "defense counsel in a noncapital sentencing proceeding should (1) promptly investigate the circumstances and facts relevant to sentencing, (2) present the court with any basis that will help achieve an outcome favorable to the defense, and (3) supplement or challenge information provided in any presentence report." *Id.* (citation omitted); *see also Sinisterra*, 600 F.3d at 907 (holding in a capital case that "counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present").  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690–91.

As for Penoncello's attempted cooperation:  Penoncello tried to become a jailhouse informant against a suspect in a high-profile case.  The day before Penoncello was sentenced, Hunter arranged for him to proffer information about conversations that he'd had with the suspect, who was incarcerated in the same part of the same jail as Penoncello.  *See* ECF No. 162 at 29.  Both the government and Hunter explained to Penoncello that regardless of what happened at the proffer session, his sentencing

hearing the next day would go forward as scheduled.  ECF No. 145-2 at 7:00–8:25.  After

Penoncello was sentenced, Hunter made repeated inquiries regarding the possibility of

a Rule 35(b)(1) motion, but the government eventually determined that Penoncello's

assistance had not been substantial enough to warrant a sentence reduction.  ECF

No. 144-5.

Penoncello now argues that Hunter should have sought a continuance of his

sentencing hearing in order to give him more time to elicit valuable information from

the target of the government's investigation.  Penoncello also argues that even absent a

formal motion from the government, Hunter should have notified the Court at the

sentencing hearing of Penoncello's attempted cooperation.

The Court will assume for the sake of argument that Hunter's performance fell

below an objective standard of reasonableness.  Penoncello is not entitled to relief,

however, because he was not prejudiced by Hunter's failure to bring his attempted

cooperation to the Court's attention.  *See Strickland*, 466 U.S. at 697 ("The object of an

ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of

an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect

will often be so, that course should be followed.").

To establish that he was prejudiced by his attorney's performance, Penoncello

"must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 694. "To satisfy *Strickland*, the likelihood of a different result must be 'substantial, not just conceivable.'" *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

The Court does not believe that, had Penoncello's attempted cooperation been brought to its attention, there is a "substantial" chance that Penoncello would have received a lower sentence. It is not uncommon for a defendant in Penoncello's position—having been convicted of multiple serious crimes and facing a very long sentence—to attempt to become a jailhouse informant. This Court generally affords such attempted cooperation little weight in the absence of a § 5K1.1 motion or some indication from the government that the defendant provided information that was valuable. The Court does not believe that, had Penoncello's attempted cooperation been brought to its attention, the Court would have given Penoncello a lower sentence.[16]

As for Penoncello's troubled childhood: Penoncello argues that Hunter's performance was constitutionally deficient because he made no attempt to develop any mitigating evidence outside of what was contained in the presentence report ("PSR").

---

[16]Insofar as Penoncello claims that, had his sentencing hearing been postponed, he could have elicited valuable information from the target of the government's investigation, Penoncello is relying on mere speculation.

This failure was prejudicial, Penoncello argues, because there was mitigating evidence regarding his difficult childhood that should have been brought to the Court's attention.

Penoncello's PSR informed the Court that his stepfather was "a verbally and physically abusive alcoholic," but did not contain any details about the abuse that Penoncello suffered as a child. ECF No. 87 at 41. Penoncello reports that he was often sent to school with visible bruises from being hit or punched by his stepfather. Def. Ex. 19 at 4–5. On one occasion, when he was 13 years old, Penoncello's stepfather came home drunk and discovered that Penoncello had spilled a bag of chicken feed. Penoncello's stepfather woke him in the middle of the night, "hit [him] a couple of times," and sent him to the chicken coop with a toothbrush and a measuring spoon to clean it up. *Id.* at 5. Penoncello worked through the night until he left for school in the morning, and he had to resume the task after he returned home. *Id.* On another occasion, Penoncello's stepfather hung his brother from a lamp post for over an hour "in the middle of the winter," and Penoncello feared that his brother would freeze to death. *Id.* When Penoncello was 12, the family home burned down, and Penoncello's stepfather was investigated for arson. *Id.* at 4. The family dog died in the fire.

These facts about Penoncello's childhood are described in a 2018 psychosexual evaluation completed by Dr. James Alsdurf, a licensed psychologist, who examined Penoncello at Richman's request. Dr. Alsdurf opines that Penoncello is "experiencing a

severe mental disorder" and that he exhibits symptoms of "clinical anxiety disorder with features of posttraumatic stress disorder." *Id.* at 8.

Penoncello argues that Hunter's failure to refer Penoncello for a psychosexual evaluation prior to sentencing was deficient performance. The Court disagrees. At the time of his sentencing, Penoncello was adamantly insisting that he had done nothing wrong. (Only after being counseled by Richman did Penoncello finally admit his misconduct.) Hunter testified that he did not refer Penoncello for a psychosexual evaluation because asking an expert to explain the psychological basis for crimes that Penoncello swore he had not committed would be pointless and perhaps even counterproductive. In Hunter's judgment, such an evaluation would only underscore the fact that Penoncello had refused to accept responsibility for his crimes. ECF No. 209 at 93–94.

The Court finds that Hunter made a reasonable strategic decision not to refer Penoncello for a psychosexual evaluation, and the Court will not second-guess that decision in the "harsh light of hindsight." *Cone*, 535 U.S. at 702; *see also Johnson v. United States*, 278 F.3d 839, 842 (8th Cir. 2002) ("When determining whether counsel's representation was deficient, a court must avoid second-guessing trial strategy." (citation and quotation marks omitted)). Accordingly, the Court finds that Hunter did

not act deficiently in failing to obtain a psychosexual evaluation of Penoncello prior to his sentencing hearing.

Penoncello also argues that Hunter should have investigated the nature of the abuse that he suffered at the hands of his stepfather and brought the details of that abuse to the Court's attention. The Court agrees. Penoncello was in bad shape at the time that he was sentenced. He had been found guilty of three awful crimes; the Court had heard evidence not only of his crimes, but of other terrible conduct in which he had engaged; he had taken the stand and perjured himself; and he continued to deny committing crimes that he had obviously committed. Penoncello's lack of remorse was bad in itself, but it also forced Hunter to maintain the pretense that Penoncello was innocent. Penoncello had dug a deep hole for himself, and Hunter was in a very difficult position. But it was critical for Hunter to try to develop and present mitigating evidence—to do *something* to try to humanize Penoncello. *See Slocum*, 854 F.3d at 533 ("trial counsel has an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present" (citation, quotation marks, and alterations omitted)).

Hunter did not do so. To the contrary, he initially filed a two-page sentencing position paper that said nothing about Penoncello's background except that he had no real criminal history. ECF No. 89. Hunter said little more about Penoncello during the

sentencing hearing, save that he had behaved appropriately around the children of his friends; he loved his son, mother, and dogs; and, by the time he finished serving a long prison sentence, his mother would be dead (she was gravely ill at the time) and his son would be grown.  This was deficient performance.

The question, though, is whether this deficient performance prejudiced Penoncello.  After giving the matter much thought, the Court has concluded that Penoncello was not prejudiced.

This Court has sentenced hundreds of defendants, and the vast majority of them had a father who was absent or abusive.  An absent or abusive father might be the single most common personal characteristic that this Court observes among criminal defendants.  The Court always takes this characteristic into account, of course, but the weight that the Court gives to this characteristic varies depending on many things, including the impact of the lack of fathering on the defendant and the closeness of the connection between the lack of fathering and the crime for which the defendant is being sentenced.

The acts of Penoncello's stepfather—as bad as they were—do not appear to have left him unable to lead a normal, law-abiding life.  Penoncello was in his late 30s at the time that he committed his crimes.  He had a high-school diploma and a significant employment record.  He had been married and was the father of a young son.  He was

far from wealthy, but he owned his own home and earned enough money to support himself. He had the unwavering support of his mother, stepfather, and brother; he enjoyed a close and evidently healthy relationship with his son; and he seems to have had a number of friends. *See* ECF No. 87 at 38, 43–44.

Moreover, the acts of Penoncello's stepfather seem unrelated to Penoncello's crimes. This is not a case in which, for example, a father getting his son addicted to drugs leads to the son's drug crimes, or a father sexually abusing his son leads to the son's sex crimes. The Court is unable to discern much of a connection between, on the one hand, Penoncello's father hitting and yelling at him and, on the other hand, Penoncello sexually assaulting a five-year-old girl and recording the assault; sexually assaulting a 14-year-old girl and recording the assault; distributing the recording of his assault of the five-year-old girl over the Internet; and amassing a large collection of videos and images of other men sexually assaulting other girls.[17]

---

[17]Penoncello points to a section of the psychosexual evaluation in which Dr. Alsdurf opines that, because Penoncello endured verbal and physical abuse at a formative age, Penoncello "never grew up" and "infantilizes himself." Def. Ex. 19 at 12. Of course, this opinion would not have been available to the Court at the time of sentencing, because Penoncello was denying all wrongdoing, and that caused Hunter to decide not to seek a psychosexual evaluation. Even if this opinion had been available at the time of sentencing, the Court would not have found it persuasive. The Court certainly agrees that Penoncello is immature, and the Court understands how his lack of maturity accounts for his unwillingness to accept any responsibility for his actions. But the psychosexual evaluation does not persuasively link Penoncello's lack of maturity to the underlying crimes.

(continued...)

As the Court explained at the time of sentencing, Penoncello's 400-month sentence was driven primarily by two things: first, the number and horrific nature of Penoncello's crimes (the Court will never be able to forget the sight and sound of Penoncello sexually molesting his girlfriend's terrified young daughter) and, second, Penoncello's refusal to take any responsibility for his crimes despite the overwhelming evidence against him.  *See* ECF No. 119 at 20–21 ("[This] is one of the longest sentences that I have imposed—but it is also an appropriate sentence as Mr. Penoncello committed some of the worst crimes that I have seen, and he has refused to take any responsibility for those crimes.").  Penoncello had a *lot* weighing against him, and the Court cannot say that, had it been aware of some of the details of the abuse suffered by Penoncello as a boy, there is a "'substantial, not just conceivable'" chance that the Court would have imposed a shorter sentence.  *Williams*, 695 F.3d at 831 (quoting *Harrington*, 562 U.S. at 112).

The Court therefore finds that Penoncello was not prejudiced by his attorney's failure to develop and present evidence about his difficult childhood.

---

[17](...continued)
The Court notes that the psychosexual evaluation indicates that Penoncello believes that he may have repressed a memory of being sexually abused as a child. *Id.* at 4.  In the absence of any corroborating evidence, however, the Court would not have given any weight to Penoncello's unfounded suspicion.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      The Court's February 6, 2019 order [ECF No. 171] is VACATED.

2.      Penoncello's March 29, 2019 guilty plea to Count 1 of the superseding

indictment is VACATED and the September 23, 2015 jury verdict [ECF

No. 78] is REAFFIRMED.

3.      Penoncello's motion to vacate, set aside, or correct his conviction or

sentence under 28 U.S.C. § 2255 [ECF No. 140] is DENIED.

4.      No certificate of appealability shall issue.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  April 7, 2021                          s/Patrick J. Schiltz
                                         Patrick J. Schiltz
                                         United States District Judge